Russell v. Croy.

RUSSELL et al., Appellants, v. CROY et al.

HOLMES et al., Appellants, v. CROY et al.

In Banc, June 18, 1901.

1. **Constitutional Amendment:** REQUISITE PUBLICATION: FOUR WEEKS.
   The Constitution requires that a proposed amendment shall be published "weekly in some newspaper, if such there be, in each county in the State, for four consecutive weeks next preceding the general election." *Held,* that the particular four weeks designated are those

Russell v. Croy.

regular calendar periods of seven days each beginning on Sunday and occurring next before the Tuesday of election day, and that a publication in every county once a week in each of those four weeks is what the Constitution requires, and not that the first publication must be in each county twenty-eight days preceding the election. (VALLIANT, BRACE, MARSHALL and GANTT, JJ., concur; BURGESS, C. J., and SHERWOOD and ROBINSON, JJ., dissent.)

2. ———: ———: NO PAPER IN COUNTY. Where the only paper in the county was issued on Monday, and the constitutional amendment was published in it on the four Mondays preceding the election, this defective publication will not defeat the amendment, because, there being no paper issued within the period required, there is no newspaper in the county, in contemplation of the constitutional requirement that the publication be made "weekly in some newspaper, if such there be."

3. ———: BALLOT. The explanatory words placed on the ballot are not designed to give minute information of the precise meaning of the proposed constitutional amendment. That is given in the Session Acts and by the publication in the newspapers. Hence, it is held, that the ballots sufficiently indicated the general purposes of the amendment in this case.

4. Third Constitutional Amendment: INVALID: DISCRIMINATION BETWEEN TAXPAYERS: U. S. CONSTITUTION. The fourteenth amendment of the Constitution of the United States prohibits any State from denying "to any person within its jurisdiction the equal protection of the laws." The third constitutional amendment to the Missouri Constitution, adopted in 1900, provides that "a mortgage, deed of trust, contract or other obligation by which a debt is secured, shall, for the purpose of assessment and taxation, be deemed and treated as an interest in the property affected thereby, except as to railroads and other quasi-public corporations, for which provision has already been made by law." Held, that this amendment so discriminates between corporations and other persons ( a corporation being, for the purposes of taxation, a "person" within the meaning of the fourteenth amendment) as to deny the railroad and other quasi-public corporations "the equal protection of the laws," in that, it requires the value of farm lands to be lessened, for taxation purposes, by the value of such security, but does not permit the value of the property of such corporations to be decreased by the value of their bonded and other indebtedness. It is, therefore, in violation of the Federal Constitution, and hence, invalid. (VALLIANT, BRACE, ROBINSON and GANTT, JJ., concur; BURGESS, C. J., SHERWOOD and MARSHALL, JJ., dissent.)

Appeal from Buchanan Circuit Court.—*Hon. W. K. James,* Judge.

REVERSED AND REMANDED *(with directions).*

*B. R. Vineyard* for appellants.

(1)   All requirements imposed by a Constitution for its amendment are mandatory and must be strictly complied with before any amendment can become a part thereof.   Governor v. Frierson, 24 Ala. 109 ; Hunt v. State, 22 Tex. App. 400 ; State v. Tucker, 15 Mont. 8 ; State v. Davis, 20 Nevada, 220 ; Livermore v. Waite, 102 Cal. 113 ; Durfee v. Harper, 22 Mont. 354 ; Judciary Amendments, 77 Miss. 566 ; Reply of Supreme Court, 14 R. I. 649 ; State ex rel. v. Secretary, 43 La. Ann. 651 ; Reply to Legislature, 6 Cush. 573 ; Russie v. Brazzell, 128 Mo. 107 ; Edwards v. Lesueur, 132 Mo. 433. (2)   The requirement of the State Constitution (art. 15, sec. 2), and our statute (sec. 7119), providing for the publication of all constitutional amendments, "for four consecutive weeks" before the general election next ensuing after their passage, means that they shall be published for four full weeks of twenty-eight days before such election.   Boyd v. McFarlin, 58 Ga. 208 ; Mitchell v. Woodson, 37 Miss. 573 ; Bacon v. Kennedy, 56 Mich. 329 ; Bank v. Bank, 89 N. Y. 397 ; Broad v. Heyman, 3 Abbott (N. S.) 396 ; Richardson v. Bates, 23 How. Pr. 516 ; Hill v. Faison, 27 Tex. 428 ; Early v. Doe, 16 How. (U. S.) 610 ; Dillard v. Krise, 10 S. E. 430 ; Martin v. Barbour, 34 Fed. Rep. 701 ; Pennell v. Monroe, 30 Ark. 661 ; Parsons v. Lanning, 27 N. J. Eq. 70 ; Francis v. Norris, 2 Miles (Pa.) 150 ; In re North Whitehall Township, 47 Pa. St. 156 ; Hernandez v. His Creditors, 57 Cal. 333 ; Smith v. Rowles, 85 Ind. 264 ; Meredith v. Chancy, 59 Ind. 466 ; Rob-

inson v. Richardson, 4 J. J. Marshall, 574; Loughridge v. City of H., 56 Ind. 253; Collins v. Smith, 57 Wis. 284; Eaton v. Lyman, 33 Wis. 34; Gibson v. Roll, 30 Ill. 172; Davis v. Robinson, 70 Tex. 394; Finlayson v. Peterson, 67 N. W. 953; Wilson v. Ins. Co., 65 Fed. Rep. 38; Pratt v. Tinckom, 21 Minn. 142; Munday v. Leeper, 120 Mo. 418; Young v. Downey, 145 Mo. 250; Young v. Downey, 150 Mo. 337; State ex rel. v. Tucker, 32 Mo. App. 628; Leonard v. Saline Co. Ct., 32 Mo. App. 633; Bean v. Barton Co. Ct., 33 Mo. App. 635; State v. Kaufman, 45 Mo. App. 656; Miner v. Tilley, 54 Mo. App. 627; State v. Kampman, 75 Mo. App. 188. (3)   The form of the ballot used in voting on the third amendment was so defective and contradictory of the amendment as to make the vote cast thereon void.   The prohibition of the statute prevented it from being counted on the proposition thereby submitted.   R. S. 1899, sec. 7122.   Like the requirements of the statute in regard to notice by publication to non-resident defendants, the ballot should have given the voters correct and full information of "the character or nature" of the amendment.   As to fullness and correctness of information required in publication notices, see Winningham v. Trueblood, 149 Mo. 584; Turner v. Gregory, 151 Mo. 103; Gamasche v. Smythe, 60 Mo. App. 163.   (4)   In all cases where constructive or substituted service or notice is required, in lieu of that which is personal, there must be a strict compliance with statutory provisions and conditions.   Charles v. Morrow, 99 Mo. 646; Quigley v. Bank, 80 Mo. 289; Wilson v. Railroad, 108 Mo. 596; Adams v. Cowles, 95 Mo. 506; Young v. Downey, 150 Mo. 326; Wade on Notice, sec. 1030; Railway v. Hoereth, 144 Mo. 136.   (5)   Notwithstanding the canvass of the votes on the third constitutional amendment, and the proclamation of the Governor as to its adoption, the courts have the right and power to ascertain by judicial in-

Russell v. Croy.

quiry, as to whether it has in fact been adopted as a part of the Constitution of the State. Collier v. Frierson, 24 Ala. 100; Trustees v. McIver, 72 N. C. 76; Westinghausen v. People, 44 Mich. 265; Koehler v. Hill, 60 Iowa 543; Oakland Paving Co. v. Hilton, 69 Cal. 479; Livermore v. Waite, 102 Cal. 113; Bott v. Secretary of State, 63 N. J. L. 289; Judiciary Amendments, 77 Miss. 565; State v. McBride, 4 Mo. 303; Edwards v. Lesueur, 132 Mo. 433. (6) A State may, for the purpose of taxation, separate property into different classes, and either levy different rates upon the different classes or tax certain classes and exempt others. By so doing the State does not deny to persons within its jurisdiction the equal protection of the laws guaranteed by the fourteenth amendment to the Constitution of the United States. Railroad v. Pennsylvania, 134 U. S. 232; American Refining Co. v. Louisiana, 179 U. S. 89. (7) But the separation of property into different classes for the purpose of taxation must be by a classification that rests upon some difference, which bears a reasonable and just relation to the use or situation of the property in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. A classification which distributes property in one class or the other only accordingly as it is owned by one kind of person or another is not proper, and if upon any such basis a classification for taxation is made, and one class taxed higher than another, or one class taxed and another exempted then the law under which the classification is made does not afford the equal protection of the laws to the persons in the class taxed at a higher rate or not exempted. Railroad v. Ellis, 165 U. S. 150; State v. Loomis, 115 Mo. 307; Pollock v. Farmer Loan Co., 157 U. S. 451; Neal v. Delaware, 103 U. S. 370; Railroad v. Taylor, 86 Fed. 186; State ex rel. v. Ashbrook, 154 Mo. 375; Williamson v. Liverpool, 105 Fed. Rep. 31; In re Flukes,

157 Mo. 125; Paddock v. Railroad, 155 Mo. 524. (8) The third constitutional amendment divides mortgages into two classes for taxation, not by any difference which bears a reasonable and just relation to their use or situation, but distributes them into one class or other, merely accordingly as the equity of redemption in the land is vested in one kind of person or another, and upon so creating the classes it discriminates between the classes by taxing all members of one class and exempting from any taxation some members of the other. It provides: First. That a mortgage upon land owned by an individual is to be considered as an interest in such land, and taxable as land held by the owner of the mortgage, even though the mortgage was originally made by a railroad or other quasi-public corporation from whom the present individual owner acquired the land. Second. That a mortgage upon land owned by a railroad or other quasi-public corporation is not to be considered as an interest in such land, and is not taxable as land held by the owner of the mortgage, even though the mortgage was originally made by an individual from whom the railroad or other quasi-public corporation afterward acquired the land. Third. The status for taxation of a mortgage as personal property or as an interest in land shifts from time to time, accordingly as the equity of redemption is owned by an individual or by a railroad or other quasi-public corporation. Fourth. After the law for the purpose of taxation divides mortgages into two classes, namely, (a) mortgages upon land in which the equity of redemption is owned by individuals and (b) mortgages upon land in which the equity of redemption is owned by railroad companies or other quasi-public corporations, it then, even though the equity of redemption in both classes are held, owned and used for exactly the same purpose, taxes all members of the first class and exempts from taxation a number of persons of the second class. It does this as follows: 1st. Mortgages

upon land where the equity of redemption is owned by individuals are declared to be interests in the land, and as such are to be charged with their just proportion of the general taxes, while mortgages upon land where the equity of redemption is owned by railroad companies or other quasi-public corporations are, if taxable at all, left as personal property. This is done even though the individual owner or the corporation alike hold the land for a similar purpose. 2nd. Mortgages upon land where the equity of redemption is owned by individuals are all declared to be interests in land and taxable as such, no matter whether held by residents or non-residents of this State, while mortgages upon land where the equity of redemption is owned by railroad companies or other quasi-public corporations remain personal property, and as such are, if held within the State by residents of this State, taxed as personal property, but if held outside the State by non-residents of this State are not taxed at all. This is done even though residents and non-residents are alike within the jurisdiction of the State for the purpose of levying a tax upon the mortgage as an interest in real estate. So construed, the amendment to the State Constitution does not afford to holders of mortgages upon land, in which the equity of redemption is owned by individuals, the equal protection of the laws guaranteed by the fourteenth amendment of the Constitution of the United States. Santa Clara County v. Railroad, 18 Fed. 385; Railroad v. Walker, 47 Fed. 681; Railroad v. Smith, 173 U. S. 684; State v. Higgins, 28 S. E. 15; Postal Tel. Cable Co. v. Railroad, 96 Va. 661; State v. Hoyt, 42 Atl. 973; Pollock v. Farmer's Loan & Tr., 158 U. S. 601; Copeland v. St. Joseph, 126 Mo. 417; State v. Wardell, 153 Mo. 319; Sprague v. Thompson, 118 U. S. 90. (9) What is commonly denominated practical construction by official usage in a department intrusted with the execution of a statute, can have no application in this case, because, be-

fore such construction can have any weight with the court: (a)
The statute to be construed must be of doubtful meaning.
United States v. Tanner, 147 U. S. 661; United States v.
Graham, 110 U. S. 219; The Swift Co. v. United States, 105
U. S. 691; Employer's Co. v. Comm'rs, 64 Mich. 614; Al-
bright v. County, 106 Pa. St. 582; Goldsborough v. United
States, Taney's Dec. 80; Wear v. Bryant, 5 Mo. 172.   (b)
The practical construction in the department must have been
uniform, consisting of an unvarying rule of application, and
which has existed for a long time.   Bailey v. Rolfe, 16 N. H.
247; Merritt v. Cameron, 137 U. S. 551; Employer's Co. v.
Comm'rs, 64 Mich. 614.   (c)   This department usage can
not be invoked to overthrow the mandates of the Constitution.
Sadler v. Langham, 34 Ala. 311; People v. Allen, 42 N. Y.
384; Story on the Constitution, sec 407.   (d)  Such official
usage at most is only persuasive in cases of doubtful construc-
tion and is not binding on the court.   In the Matter of M. S.
Inst'n, 82 N. Y. 142; Loon v. Lyons, 61 N. Y. 22; State v.
Fricke, 102 Wis. 107; s. c., 77 N. W. 732, and 78 N. W.
455; 23 Am. and Eng. Ency. of Law (1 Ed.), 27.   The ap-
plication of any one of these legal principles, to the facts ap-
pearing in this record, would exclude from the court's considera-
tion the usage heretofore followed in part by the Secretary of
State in the publication of constitutional amendments.

*Edward C. Crow,* Attorney-General, for respondents.


(1)   The appellant contends that the third amendment
denies to citizens of Missouri the equal protection of the laws
because the said amendment does not apply to railroad and
other quasi-public corporations, and that because the same
method of assessment is not provided for fixing the valuation
for taxation of real estate and of railroad property and the

property of other quasi-public corporations, therefore, there is created an inequality under the fourteenth amendment of the Federal Constitution. But if the contention be simply that railroad property is placed in a class for purposes of taxation separate from other property, it must be held to be no legal objection because both our State and the Federal Supreme Court have justified the classification of railroad property as a special and distinct class of property for purposes of assessment. 64 Mo. 306; 50 Mo. 376; 115 U. S. 336. I direct the attention of the court to the fact that there is nothing in the Constitution of Missouri which requires a tax to be levied by a uniform method upon all descriptions of property. (2) The appellant contends that the phrase, "for which provision has already been made by law," refers to the existing law for the taxation of mortgages as personal property. And appellant then proceeds to argue that the amendment creates two classes of mortgages for the purposes of taxation, the one to be taxed as real estate and the other as personal property. I have been unable to find any provision of the statutes prior to the adoption of the third amendment that provides for the taxation of mortgages as personal property, or in any other manner. The fact is, that prior to the third amendment, mortgages on realty or on personalty were not listed for taxation or required to be listed, but the notes the said mortgages secured were required to be listed for taxation. The phrase, "for which provision has already been made by law" does not, as appellant contends, refer to the existing law for the taxation of mortgages, but refers to the existing law for the taxation of the property of railroad and other quasi-public corporations. (3) It is the property of the mortgagor of real estate that is affected by the third amendment, and the property value for purposes of taxation of railroad property and property belonging to other quasi-public corporations that is not affected by said third

amendment.   It should be remembered that no exemption from taxation is created by the third amendment, so far as railroad and other quasi-public corporations are concerned. It should also be remembered that the owner of a bond secured by a mortgage on a railroad in Missouri is not exempted from taxation on said bond by the third amendment.   Section 9339, Revised Statutes 1899, provides that the State Board of Equalization shall assess the roadbeds, tracks, depots, water-tanks and turntables of railroads and the engines and cars of every description and all other movable property owned, used and leased by them in the operation of their road.   Section 9360 provides that all property, real, personal or mixed, including land, machine and workshops, roundhouses, workhouses and other buildings, goods, chattels and office furniture of whatever kind owned or controlled by any railroad company or corporation in this State, shall be assessed by the proper assessors of the several cities, counties, towns and villages wherein such property is located under the general revenue laws of the State. These two sections clearly show that all land not used in the operation of the railroad is to be assessed as local property is assessed.   The third amendment literally means that it should be read as follows:   "A mortgage, deed of trust, contract or other obligation, by which a debt is secured, shall, for the purposes of assessment and taxation be deemed and treated as an interest in the property affected thereby, except as to railroad property and the property of other quasi-public corporations, for which provision has already been made by law," and that the phrase, "for which provision has already been made by law" refers to the provisions existing for the taxation of property used as railroad property or property used by other quasi-public corporations.   On page 685, 47th Federal Reporter, the United States District Court, discussing the statute exempting land, defined the term "railroad property" as follows:   "The

term railroad property, is commonly understood to mean the property which is essential to the railroad company to enable it to discharge its functions and duties as a common carrier by rail. It includes the roadbed, right of way, tracks, bridges, stations, rolling-stock and such like property. On the other hand, land owned and held for sale or other disposition for profit and in no way connected with the use or operation of the railroad is not railroad property in the sense mentioned, but is property of the railroad company independently of its functions and duties as a common carrier." The court should construe this third amendment so as to harmonize with the Constitution and the provisions of our statute, if possible, and the construction I suggest does harmonize the amendment with the Constitution and statutes of this State. Now, it is contended by appellant that, under the third amendment, if a railroad company owns five thousand acres of land not used in connection with the operation of its road, and a citizen owns five thousand acres alongside of that land in this State, one is subjected to the terms of the third amendment and the other is not, for the reason that a railway owns one piece of land and a citizen owns the other. But, as we have seen, under the terms of our statute, the land of the railway company not used in the operation of its road is assessed in exactly the same manner as the land of the individual, and as the third amendment affects the property to be assessed and not the mortgage, and as it does not except from its provisions land owned by a railroad company not used in connection with its road, the result logically follows that such land so owned and not used by said railroad company in connection with its railroad, is subject to the terms of the third amendment. The well-established doctrine of this State and all the States is that the franchises of railroad companies and their earnings and other property used in the actual operation of the railroad may well be

classed by themselves for purposes of taxation and taxed by different methods and rules from those applied to other property. This being so, why should a construction be given the third amendment which would remove land from the property locally assessable and remove it from its distinct character as real estate and place it in the class of railroad property included in the roadbed, right of way, tracks, bridges, station-houses, rolling-stock and such like property? The construction I have suggested creates no discrimination between persons or classes of persons within the confines of our State. If the amendment can be so construed as to create no discrimination, is it not the duty of this court to so construe it? The railroad property and the real estate of the citizen both have their situs in the State of Missouri and both are, for the purposes of taxation, within the jurisdiction of the State. This being so, the Federal Supreme Court, in the case of Curtland v. Hotchkiss, 100 U. S. 499, said: "The debt then having its situs at the creditor's residence, both he and it are, for the purposes of taxation, within the jurisdiction of the State. It is consequently for the State to determine, consistently with its own fundamental law, whether such property owned by one of its residents shall contribute by way of taxation to maintain its government. Its discretion in that regard can not be supervised or controlled by any determination of the Federal Government, for the reason, too obvious to require argument in its support, that such taxation violates no provision of the Federal Constitution. Nor does it, as is further supposed, abridge the privileges and immunities of the citizens of the United States, or deprive the citizens of life, liberty or property without due process of law, or violate the constitutional guarantee that the citizens of each State shall be entitled to the privileges of citizens in the several States. Whether the State of Connecticut shall measure the contribution which persons

resident within its jurisdiction shall make by way of taxes in return for the protection it affords them by the value of the credits, choses in action, bonds and stocks, which they may own, is a matter which concerns only the people of that State, with which the Federal government can not rightly interfere." And, again, the Federal Court, speaking on the right of the State to classify property for taxation in the case of State tax on foreign-held bonds, 15 Wallace, p. 300, said: "Unless restrained by the provisions of the Federal Constitution, the power of the State as to the mode, form and extent of taxation is unlimited, where the subjects to which it applies are within her jurisdiction." The fourteenth amendment does not create an arbitrary distinction in the method of assessment of the same kind of property, based wholly upon the ownership. Why has a difference been made by our State and by all the States in the method of assessment and taxation of railroad property and real estate for a half century and sanctioned by the courts? Because it is unlike real estate and other property. Because of the difference in character, condition and use of this kind of property from other property that justifies the difference in classification and the mode of taxation. If the General Assembly has power in this State and in other States to provide for a difference in classification and the mode of taxation of railroad property from other property, why have not the people, by a constitutional amendment, the same right to provide for a different classification and mode of taxation of railroad property from other property? It has been admitted by counsel for the respondent that such power to so classify railroad property for assessment and taxation does exist. This court must concede such power exists or reverse its former decisions, because on two occasions this court has justified the classification of railroad property as a special and distinct

Vol 164 mo—6

class of property for assessment and taxation. 64 Mo. 306; 58 Mo. 376. (4) Up to this point all will concede that as to the property actually used by a railroad company in the operation of its road and the performance of its duty as a common carrier, a difference in the method of assessment and taxation between such property and real estate and other property is justifiable, based upon a difference in character, condition and use of railroad property. If this is true, then it would not be objectionable to provide one method for the assessment and the taxation of real estate owned and used as a farm and incumbered with a mortgage and another method for the assessment and taxation of the property of a railroad company used in the operation of the railroad and which said property is also incumbered with a mortgage. The fact is, that prior to the adoption of the third amendment, neither real-estate mortgages nor railroad mortgages, as such, were subject to assessment and taxation. Railroad mortgages are not now subject to assessment and taxation. The statutes of Missouri have never, so far as I know, prior to the enactment of 1901, provided for the assessing and the listing of mortgages of any kind. The notes, in case of real estate mortgages, and the bonds in case of railroad mortgages, have been subject to taxation and the statutes have provided for listing and assessing them. The notes and the bonds were deemed personal property and listed and assessed as such. But there is a manifest difference between the debt which is a mere chose in action and the land which secures its payment. The mortgage prior to the third amendment was not subject to assessment and taxation as personal property nor as real property, but the note which the mortgage on the land secured the payment of was subject to taxation as personal property, but now the note is no longer subject to taxation as personal property, but the mortgage securing the money loaned is treated as real estate

Russell v. Croy.

and assessed and taxed as such.   Prior to the third amendment, the note was taxed to the owner and the full value of the land was assessable to the mortgagor.   The thing sought to be taxed, to-wit, the money loaned, evidenced by the note and secured by the mortgage, is made real estate for the purpose of assessment and taxation.   If it is real estate, no doubt exists but that a different method of assessment and taxation can be provided for it than that fixed for assessing railroad property used in operating a railroad.   The mortgage is treated as real estate and the form of the assessment of the debt has been changed from an assessment of the note as personalty to an assessment of the mortgage as real estate.   Can this change be made by a constitutional provision or a statutory enactment without violating the fourteenth amendment and producing an illegal inequality in taxation?   It will be observed that the only change is in the form of the assessment: that the mortgage was an interest in the real estate before the third amendment was adopted and is yet an interest in real estate; the note was personal property before the adoption of said amendment and is yet personal property; the mortgage is now assessed but was not before, and the note is not assessed but was before, but the ownership of the debt, the chose in action, is not changed. The question of the right of the State to say that the interest of the mortgagee shall be assessed as an interest in the land, has been before the Federal Supreme Court, and was decided in 169 U. S. 421.   The court, in 169 U. S. 427, said:   "The State may tax real estate mortgaged as it may all other property within its jurisdiction at its full value.   It may do this either by taxing the whole to the mortgagor or by taxing to the mortgagee the interest therein represented by the mortgage and to the mortgagor the remaining interest in the land, and it may, for the purposes of taxation either treat the mortgage debt as personal property to be taxed like other choses in action

to the creditor at his domicile, or treat the mortgagee's interest in the land as real estate to be taxed to him at its situs." See also the following cases to the same effect: Fireman's Insurance Co. v. Commonwealth, 137 Mass. 80; State v. Runyon, 12 Vroom (41 N. J. L.) 98; Darcy v. Darcy, 22 Vroom (51 N. J. L.) 145; People v. Smith, 88 N. Y. 585; Common Council v. Assessors, 91 Mich. 92. The court continuing, said, "The statute of Oregon, the constitutionality of which is now drawn in question, expressly forbids any taxation of the promissory note (our statute enacted in 1901 also expressly forbids any taxation of the promissory note) or other instrument of writing, which is the evidence of the debt secured by the mortgage; and with equal distinctness, provides for the taxation, as real estate, of the mortgage interest in the land. Although the right which the mortgage transfers in the land covered thereby is not the legal title, but only an equitable interest and by way of security for the debt, it appears to us to be clear upon principle, and in accordance with the weight of authority, that this interest, like any other interest legal or equitable, may be taxed to its owner, whether resident or non-resident in the State where the land is situated, without contravening any provision of the Constitution of the United States." The case above mentioned settles beyond dispute the question that a State may tax the mortgagee's interest as real estate and that such taxation violates no clause of the Federal Constitution. The railroads not being within the terms of the act, were, of course, exempted from its provisions. This decision in the Oregon case then is a direct adjudication that a law similar to the third amendment is not in violation of the fourteenth amendment, because it does not apply to railroad property and the property of other quasi-public corporations. A statute similar to our third amendment has been sustained in New Jersey and in Massachusetts and in Michigan. 137

Mass. 80; 41 N. J. L. 98; 51 N. J. L. 140; 91 Mich. 92. (5) There is no additional burden cast upon the holder of a mortgage on real estate owned by an individual. The holder of a mortgage on real estate securing a note executed by an individual prior to the adoption of the third amendment was not assessed upon the mortgage, but was assessed upon the note the mortgage secured. Now, the note is not assessed and the mortgage representing the value for assessment of the note is assessed, but listed, not as personal property, but as real estate. The mortgagor is relieved from the payment of taxes on his land to the extent of the assessable value of the mortgage. But no additional taxes are demanded of or assessed against the holders of the mortgage. No exemption is extended to the holders of a railway bond secured by a mortgage on the railroad. The owner of the railroad bond is assessed on his bond just as he was before, and it is assessed to him as personal property. The inequality could only exist, if at all, between the individual mortgagor of real estate and the corporate mortgagor of railroad property or other quasi-public corporations incumbering its property. The amendment itself shows that the only property intended to be exempted from its provisions was the property of railroads, and other quasi-public corporations, actually used in the operation of the railroads or in carrying on the business of the quasi-public corporation. In order to exempt land owned by a railroad corporation, and not used in connection with the operation of the road, from the terms of the third amendment, said amendment must be construed to repeal by implication the provisions of section 9360, Revised Statutes 1899, which specifically declares such property is not subject to assessment as railroad property, but provides that "All property . . . . . . including lands, machine and workshops, roundhouses, warehouses and other buildings . . . . . . of whatever kind owned or controlled by any railroad

company in this State, not hereinbefore specified, shall be assessed by the proper assessor in the several counties wherein such property is located under the general revenue laws of the State." Endlich on Statutory Interpretation, sec. 113. (6) Every statute for the levy of taxes is in a sense a statute making exemption; that is, that it leaves many things untaxed which it would be entirely competent to tax if the taxing power had deemed it wise and politic. One State will lay the burden on property only, another on property and corporations, and another on property and different kinds of business, and so on. Revenue laws sometimes permit taxpayers to deduct from the property to be taxed, the debts owing by them. 88 N. Y. 142; 55 Ind. 433. Sometimes the deduction is for credits only; sometimes for mortgages; that is the fact in the case of the third constitutional amendment which in the last analysis is simply the deduction of allowance made for the debt of the mortgagor. Sometimes allowance is made from the aggregate of personal estate. The whole theory of such allowance is made to reach the just amount of taxable property. (a) The right to make exemptions is involved in the right to select the subjects of taxation and apportion the public burdens, and must consequently be understood to exist in the lawmaking power whenever it has not in terms been taken away. Cooley on Taxation, 200. (b) Some of the customary exemptions from taxation are in themselves so reasonable that they readily receive universal assent as proper and politic. Such are the exemptions of household furniture, tools in trade, and so forth, for a moderate amount, and the personal property of those who, by reason of age, infirmity or poverty, are unable to contribute to the public burden. 56 Pa. St. 315; 62 Me. 62; Cooley on Taxation, 201. (c) It is also customary to exempt from taxation the property of charitable corporations or associations, so far as it is actually made use

Russell v. Croy.

of for charitable purposes.   School property and all property
actually devoted to the business of public instruction is com-
monly exempted, though held and owned by private corpora-
tions and individuals.   The property owned by religious so-.
cieties and made use of for the purpose of public worship is
also commonly exempted; and the property of cemetery as-
sociations is commonly exempted, so far as it is actually used
for the purpose of burial; and the State sometimes makes a
bond, or other indebtedness issued by itself, untaxable, and
often railroad property is exempted from taxation.   Cooley on
Taxation, 209.   (d)   And the courts all hold that mere in-
equality in the amount of taxation does not invalidate the tax.
Cooley on Taxation, pp. 220, 221; 8 Hump. 290; 7 Cal. 35;
20 Kan. 596; 11 R. I. 321; 16 Pick. 572; 49 Pa. St. 519;
37 N. H. 556; 90 N. C. 409; 45 N. J. 480; 42 Tex. 288.
(e)   The contention of appellant's counsel that an exemption
from taxation to a certain class on a certain kind of property
by constitutional provision is illegal, leads to the logical de-
duction that all exemptions are in violation of the fourteenth
amendment, because they necessarily result in some inequali-
ties in the payment of taxes.   (f)   Suppose, as is the case
in some States, our Constitution provided railroads should only
be taxed on their gross earnings in lieu of all other taxes.
Would this be unconstitutional, because it exempted land
owned by a railroad company from assessment and taxation by
the general revenue laws of the State as the land of individ-
uals is assessed and taxed?   Of course not.   Such laws have
been enacted and enforced in various States.   (g)   The
courts of New Jersey, Massachusetts, New York and Michi-
gan have all held that a deduction for a certain class of in-
debtedness was valid.   No court of last resort has ever held
otherwise.   The third amendment is but a deduction for the
mortgagee's indebtedness.   In fact, the mortgagor only owns

the equity of redemption, and is really by the third amendment only taxed on just what interest in the property he owns and, therefore, the deduction for his indebtedness can scarcely be called an exemption from taxation, because, really not owning the mortgagee's interest, the mortgagor in justice should not be taxed on it.

VALLIANT, J.—These two cases come here by appeal from the circuit court of Buchanan county. The plaintiffs are holders of notes secured by mortgages on lands in that county, which are owned by individuals. The defendants are the assessor and the members of the county court. The object of the suits is to prevent the defendants from enforcing against the plaintiffs the terms of the third constitutional amendment voted on and declared adopted at the general election in November, 1900.

The proposed amendment was to add to article 10 of the Constitution, two sections as follows:

"Section 22. A mortgage, deed of trust, contract or other obligation by which a debt is secured, shall, for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby, except as to railroad and other quasi-public corporations, for which provision has already been made by law; in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, in the manner hereinafter to be provided by law, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city or other local subdivision in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security; if paid by the owner of the security, the tax so

levied upon the property affected thereby shall become a part of the debt so secured; if the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and to the extent of such payment a full discharge thereof: Provided, that in all such cases the interest of the owner of the security, as well as that of the owner of the property affected by such mortgage, deed of trust, contract or obligation shall be assessed on terms equally fair and just. If the note or other obligation secured, is entitled to a credit by payment on the principal thereof, the assessable value of the owner of the security, upon the fact being made known to the assessor prior to the assessment, shall be diminished by the amount of such payment, and the assessable value of the owner of the land or other property, correspondingly increased, the intent hereof being to place those interested in any way in such land or other property, on the plane of absolute equity as to taxation.

"Section 23. Every contract hereafter made by which a debtor is obligated to pay any tax or assessment on money loaned, or on any mortgage, deed of trust, or other lien, shall, as to any interest specified therein and as to such tax or assessment, be null and void."

The contention of the plaintiffs is that this amendment was not legally adopted, and that it is in violation of the fourteeth amendment to the Federal Constitution. The judgment of the circuit court was that the amendment was legally adopted and that it was not obnoxious to the Federal Constitution, and that plaintiffs' mortgage notes were subject to taxation as therein indicated. From that judgment the plaintiffs appeal. There is no dispute as to the facts.

I. Appellant's first proposition is that notice of the proposed amendment was not published for the length of time required by law. The requirement of the Constitution on that

point (sec. 2, art. 15) is: "The proposed amendments shall be published with the laws of that session, and also shall be published weekly in some newspaper, if such there be, within each county in the State, for four consecutive weeks next preceding the general election then next ensuing."

The general election in 1900 occurred November 6th, which was the first Tuesday in that month. The record shows that the notice was published in every county once a week in each of the following weeks in October, viz., the weeks beginning Sunday the 7th, 15th, 21st, and 28th. In eighteen counties only, there was in each a publication in the week beginning Sunday, September 30, and continuing through October. The publications in the week beginning October 7th, were made as follows: In one county on Monday the 8th, in one on Tuesday the 9th, in eight counties on Wednesday the 10th, in fifty-four on Thursday the 11th, in forty-three on Friday the 12th, and in eight on Saturday the 13th. That was caused from the fact that the county newspapers were published weekly in those counties, respectively, on those days only. The result was that whilst there was a publication in every county once a week in the four consecutive weeks next preceding the day of election, yet in a majority of the counties the first publication was less than twenty-eight days before that day, and for that reason appellants say the requirement of the Constitution on that point was not fulfilled, and the election was invalid. A decision of this point requires a construction of that clause of the Constitution above quoted. To aid us in this study we are referred to decisions of this and other courts construing statutes somewhat similar. In Young v. Downey, 150 Mo. 317, we construed the statute which prescribes the notice to be given by an administrator of his application to the probate court for authority to sell land for the payment of debts. In that case the subject was thoroughly

considered, and the previous decisions reviewed by BURGESS, J., speaking for the court, and we are entirely satisfied with the conclusion therein reached and the interpretation of the statute then under consideration.    But the same words occurring in different statutes of somewhat similar character do not necessarily bear the same interpretation; their meaning is influenced by the particular context and sometimes by the object to be attained by the statute itself.    Thus in Young v. Downey, supra, wherein the words "four consecutive weeks" were shown to mean twenty-eight days, a former decision of this court, in which it was held that the notice "was published in a weekly paper, for four consecutive numbers, which makes four weeks" (Haywood v. Russell, 44 Mo. 252), was held not to be in conflict with the view then taken of the statute then under consideration, for the very obvious reason that there was difference in the context and also in the purpose of the two statutes. In Haywood v. Russell, the publication was of a notice to a non-resident defendant in an attachment suit which the statute required to be for four weeks, and the last insertion to be four weeks before the return term of the court.    In Young v. Downey the statute was:   "Such notice shall be published for four weeks in some newspaper in the county in which the proceedings are had."   [G. S. 1865, sec. 25, p. 498; sec. 148, R. S. 1899.]   If four weeks under all circumstances and in every connection must mean twenty-eight days, then in the attachment suit against a non-resident defendant, the publication would have to run twenty-eight days, and be completed four weeks before the commencement of the term, but that is what this court has said the statute does not mean. In the statute concerning the sale of real estate by order of the probate court, the requirement is that the notice be "published for four weeks" without any limitation or qualification as to that period.

So that, according to the interpretation we have given the statutes in regard to notice to non-residents in attachment and such like suits, and in regard to sales of real estate by order of the probate court, requirement of publication for four weeks successively in the one, is satisfied by a publication in a weekly paper for four consecutive numbers, the last insertion to be four weeks (as it formerly was, G. S. 1865; fifteen days as it now is, sec. 581, R. S. 1899) before the return day of the term, while in the other the publication must cover a period of full twenty-eight days before the return day, and there is no inconsistency in the two interpretations, and both are right.

Now, in the clause of our Constitution regarding the publication of notice of the submission of a constitutional amendment to the vote of the people, we have the words "four consecutive weeks," but they are in context with words different from those in connection with which the same are used in the statutes above mentioned. The language we now have to construe is, "Shall be published with the laws of the session at which they are proposed, and also in some newspaper, if such there be, in each county in the State for four consecutive weeks next preceding the general election then next ensuing," etc. The four weeks here called for are not any four weeks the Secretary of State may select prior to the election, but they must be the four weeks next preceding the election. If the Secretary of State had chosen to begin the publications on the first day of September and run them into the first week in October so as to secure, with the varying days of publication among the newspapers, a full period of twenty-eight days, that would not have answered the requirement of the Constitution, because the four weeks so covered would not have been those next preceding the election. And if he had run the publication so begun, through the month of October and thus covered more than twenty-eight days or four weeks, still the only period

of the publication that would have answered the requirement of the law would have been the four weeks next preceding the election, the rest would have been in legal effect as if it had not been.   If the publication should be for four weeks and it began five weeks before the day of the election, it would not have covered the period called for by the Constitution, because it would not have covered the week immediately preceding, and if had continued five weeks up to the day of the election, the only valid publications would be those in the last four weeks, and if the days of publication in those weeks did not compass twenty-eight days, any other group of twenty-eight days carved out of the five-weeks period would not avail.   If we must construe the Constitution in this respect as strictly as appellants would have us to construe it, and if we must say that four weeks there means twenty-eight days, then we must say that the four publications called for must have occurred within the twenty-eight days next preceding November 6th, that is, from Tuesday, October the 9th, to November the 5th, both inclusive, not sooner than the one nor later than the other date.   But in a county where the newspaper was not published on Tuesday, the publication could not begin on the 9th, and if Saturday was the day of issue, the first insertion within the twenty-eight days next preceding the election would be on the 13th.   If the officer had begun to publish on the Saturday previous in order to cover the full limit of twenty-eight days, he would have compassed thirty-one days, but he would not have accomplished a publication once a week within the last twenty-eight days, and he would have fallen outside the constitutional line, if four weeks in that connection means twenty-eight days.

The Constitution uses the words "four consecutive weeks." The word "week" in its most accurate sense means seven consecutive days beginning with Sunday; in that sense it is most usually used.   But it is also appropriately used to mean seven

consecutive days beginning with any day. If we mark off the four weeks next preceding Tuesday, November the 6th, according to the first meaning of the word above given, then we would have the four weeks beginning each, Sunday October the 7th, 14th, 21st and 28th, and ending Saturday, November the 3d. Within that meaning of the word those are the particular four weeks specified by the Constitution during which in each the notice must be published once. If we mark them off on the calendar by periods of seven days, not regarding Sunday as the first of each, then we would have four weeks beginning each, Tuesday October the 9th, 16th, 23d and 30th, and ending Monday November the 5th, and within each of those periods there must be a publication. Whether we begin to count the week with Sunday or Tuesday, the four that we so mark off are the four which the Constitution calls for, and none other will satisfy. The record in this case shows that in each of those weeks, whether marked off by one rule or the other, there was a publication of the notice with one exception, that is, if we begin to count with Tuesday, October the 9th, there was no publication that week in Dallas county because the only paper in the county was issued on Monday alone.

The Constitution qualifies its requirement in this respect by saying the publication shall be made "weekly in some newspaper, if such there be." Of course, if there should be no newspaper in the county, or, what is the same thing, if it be not issued within the period required, the publication in that county is not required.

It appears from the record before us that since the adoption of our Constitution in 1875, there have been twenty amendments submitted to a vote of the people by joint resolution of the General Assembly, beginning in 1878 and following in 1882, 1884, 1886, 1890, 1892, 1894, 1896 and 1900, and that in every instance the notice has been published for the

same period that this notice was. Thus it appears that the Executive Department was early called on to construe the clause in the Constitution which we have just been considering and the construction it placed upon it was that the particular four weeks designated were those regular calendar periods of seven days each, beginning on Sunday and occurring next before the Tuesday of election day, and that a publication in each of those periods was what the Constitution required. The Executive Department has never changed its rulings on that point and all the amendments of the Constitution that have been adopted have been by a vote of the people on notice given in accordance with that interpretation. A very large and important part of the State government has rested for the last ten years on an amendment to the Constitution adopted in accordance with that interpretation. Even if we have any doubt about the correctness of the construction given by the Executive Department, we should hesitate to overthrow a rule of construction upon which so much had been builded. There is a very learned and demonstrative argument in the brief of the Attorney-General to show that under such circumstances the court should follow the construction placed by the Executive Department on the written law. The position is supported not only with forceful argument but abundant authority, but as we agree with the Executive Department in the interpretation it has given the clause, the question of whether we would be bound by or justified in following regardless of our own views, if to the contrary, the long-established rule of the Executive Department, is not before us for decision. We hold that the publication of the notice in this case was made as the law requires.

II. The next point advanced by appellants is, that the ballot was not sufficient in form. Section 7122, Revised Statutes 1899, prescribes the form of the ballot to be voted on a

proposition to amend the Constitution, and among other re-
quisites is: "The Secretary of State shall certify to the differ-
ent county clerks, or other proper officers, the form of the
ballot, which shall also state or indicate the character or nature
of the proposed constitutional amendment or amendments to be
voted on; which statement, indicating the character or nature
of any proposed constitutional amendment, shall be printed
upon the official ballot, in addition to and in connection with the
form above provided." The form of the ballot in this in-
stance was:

"THIRD CONSTITUTIONAL AMENDMENT (Providing that
the value of property subject to mortgage, deed of trust, etc.,
less the value of such security shall be assessed to the owner of
the property, and the value of the security assessed to the
owner thereof; and that a contract made in violation of such
provision is null and void). Yes."

Then the same form is repeated ending, "No."

Appellants contend that this did not indicate to the voters
the nature of the proposed amendment, and that it was "mis-
leading, confusing, defective, and contradictory, deceiving the
voters," etc.

The law requires that the proposed amendment be pub-
lished in the session acts of the General Assembly at which
they were proposed, and in a newspaper in each county for four
consecutive weeks, and two or more copies printed in great
primer poster type, posted at each voting place. It is by those
methods that the people are to be informed of the precise mean-
ing of the proposed amendments. The indication to be placed
on the ballot is not designed to give that minute information,
but only to inform the voter in a very general way of the sub-
ject. When, as in the last election, there are several amend-
ments to be voted on, the voter would not be apt to remember
each by its number and so to prevent confusion or mistake

he is informed by the ballot that the first relates to making information and indictment concurrent remedies; the second to providing for the levy of a road and bridge tax; the third to provide that the value of property subject to mortgage, deed of trust, etc., shall be assessed, etc. That method simply distinguishes one proposed amendment from another, if there are more than one, and whether one or more, calls the general subject to his attention.

The general purpose of this amendment was sufficiently indicated on the ballot.

III. We come now to consider the most serious objection alleged against the validity of the amendment, that is, that it is in violation of the fourteenth amendment of the Constitution of the United States.

Under our system as existing before the adoption of this amendment, mortgages on real estate are taxed as personal property and the mortgagee is required to give them in for taxation, while the land is also taxed on its assessed value without deducting the value of the mortgage. Thus, there is, in theory at least, a double taxation on the value of the property.

By this amendment the mortgagee is to be deemed to have taxable interest in the property and the value of that interest is to be deducted from the total assessed value of the property, leaving the mortgagor to pay taxes on the assessed value of the equity of redemption. It was supposed that in this way mortgage securities could be more effectively reached for taxation, than experience shows they have heretofore been. [Judson on Taxation, 282.] The language of the amendment is: "A mortgage, deed of trust, contract or other obligation by which a debt is secured, shall for the purposes of assessment and taxation, be deemed and treated as an interest in the property

Vol 164 mo—7

affected thereby, except as to railroad and other quasi-public corporations, for which provision has already been made by law; in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, in the manner hereinafter to be provided by law, and the value of such security shall be assessed and taxed to the owner thereof in the county, city, or other local subdivision in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security," etc. The point made by the appellants is that whilst this amendment seeks to impose the burden therein specified upon them, as holders of mortgages executed by individuals, it expressly exempts from such burden those who hold mortgages executed by railroad and other quasi-public corporations. They say that under the terms of this law a man holding bonds issued by a railroad or other quasi-public corporation secured by a mortgage of lands of the same kind, in use for a like purpose and lying by the side of the lands covered by the mortgages they hold, is expressly free from the burden that is thereby laid upon them, and therefore they are not afforded "equal protection of the law." This amendment is copied, with a slight addition, from the Constitution of California, where it was adopted in 1879, and where it is still the law. We therefore naturally look to that State for decisions construing it. In C. P. R. R. Co. v. Board of Equalization, 60 Cal. 35, the plaintiff, the railroad company, challenged the validity of that clause of the Constitution as being in violation of the fourteenth amendment of the United States Constitution in that it denied it the "equal protection of the laws," by requiring it to pay taxes on the value of its mortgaged property, without deducting the value of the mortgage, while it made a different rule for an individual mortgagor. The court, conced-

ing the inequality complained of, held nevertheless that in
the matter of taxation the State was supreme, and that the law
was not in violation of the fourteenth amendment, because the
provisions of that amendment embraced only natural persons
and did not include a railroad corporation.   Afterwards, in
a group of cases, the question came before the United States
circuit court for that district; the court was aided by an array
of able counsel on both sides, and the subject was considered
by the court with the care that its great importance and the
large interests involved demanded.   Mr. Justice FIELD de-
livered the opinion, holding the California law to be a pal-
pable violation of the requirements of the fourteenth amend-
ment, upon the very points, which the appellants in the case at
bar now advance.   [County of Santa Clara v. S. P. R. Co.,
18 Fed. R. 385.]   That group of cases went to the Supreme
Court of the United States, but the cases there were decided on
another point, and the point now being considered was not passed
upon.   But at the argument Chief Justice WAITE said: "The
court does not wish to hear argument on the question whether
the provision in the fourteenth amendment of the Constitution,
which forbids a State to deny to any person within its juris-
diction the equal protection of the laws, applies to corpora-
tions.   We are all of the opinion that it does."   [Santa Clara
Co. v. S. P. Ry. Co., 118 U. S. 394.]   If what the court
there said by its chief justice be regarded as only *obiter dictum,*
the same has since more than once been pronounced by the
court in solemn judgment.   [Covington, etc. v. Sandford, 164
U. S. 578, 592; U. S. v. Northwestern Exp. Co., Id. 686,
689; Gulf C. & S. F. Ry. v. Ellis, 165 U. S. 150, 154.]
In the last case, the court, per Mr. Justice BREWER, said:
"It is well settled that corporations are persons within the pro-
visions of the fourteenth amendment of the Constitution of
the United States," and cited several previous decisions of that

court to the same effect.    If the question of the validity of this clause in the California Constitution, in the light of the fourteenth amendment, has ever received any further consideration in the California or Federal courts, our attention has not been drawn to the case.

In a later case in the Supreme Court of the United States Mr. Justice FIELD referred to the omission of the court, to decide the question in the Santa Clara County case, and said it would continue to come up until it was decided.    [San Bernardino Co. v. Ry., 118 U. S. 422.]    In Guthrie, on the Fourteenth Amendment, published in 1898, the author, referring to the comment of Mr. Justice FIELD in the case last cited, at p. 121, says:    "That was in May, 1886, but the point has not been squarely decided to this day."

But the constitutional provision in question has been the law of California ever since its adoption in 1879.    Why the war against it, which was so fierce in the beginning, has apparently ceased, and its operation suffered to go on without question, we do not know.    Mr. Judson in his recent book on Taxation in Missouri, which was published while the adoption of this amendment was pending in this State, at p. 287-8, says: "As we are now asked to adopt a system which has been in force in California for over twenty years, it is important to study the experience of California with reference to this very matter.    This subject has been carefully investigated by Prof. Carl C. Plehm, professor of history and political science in the University of California, in a recent article.

"As a result of an exhaustive investigation, he finds that the provision against the shifting of the tax back to the mortgagor has proved wholly ineffective.    So successful have been the devices to shift the burden of the tax upon the mortgagor, that they have come into practically universal use, and printed blanks are used embodying agreements, which have been sus-

tained by the Supreme Court of the State.    Prof. Plehm says:
'Possibly the oldest and certainly the most widely used of the
successful devices invented for this purpose, is that of a con-
tract separate and distinct from the mortgage, in which the
creditor agrees to reduce the interest, in case the debtor pays
the taxes.    The method is so common in the south that all
stationers carry regular blank forms of these contracts.'    And
he adds:

" 'The feeling that the provision of the Constitution which
requires the mortgagee to pay the taxes accomplishes no good
and really increases the burden of debt, and that its evasion
affords the debtor a genuine relief, while working no injustice
to the creditor, probably accounts for this far-reaching opinion
rendered in the recent case of the London and San Francisco
Bank v. Bandman, 120 Cal. 221 (decided March 31, 1898).
In this case, it was held that a valid agreement, not simultan-
eous with or directly a part of the mortgage, providing for the
payment of taxes by the mortgagor does not violate the con-
stitutional provision.    This sweeping decision makes the con-
stitutional provision entirely devoid of meaning and brings
the California system of taxing mortgages into practical con-
formity with that of Massachusetts.   That is, the two parties
to the mortgage can make any agreement they please as to the
payment of the tax.

" 'Thus it is that this famous "experiment in taxation"
has come to an end.'

"As we are now asked to adopt a constitutional provision
of another State, which has been construed by the Supreme
Court of that State, will we not adopt this construction with
the amendment?"

It may be, therefore, that evasion of the law has been
found so much easier than contesting its validity, that the legal
warfare has ceased and the patient borrower bears the burden

as of old. We do not know of another State that has copied this feature of the California law, and if, as indicated in the above quotation, the conflicting interests there have made peace on terms that practically annul the law, that fact may account for the absence of other decisions on the question.

Just why the holders of "railroad and other quasi-public corporation" securities were exempted, while all others were included, is not entirely clear. Evidently it was so written in our amendment because we copied it from the California law. But it is not always easy to adjust a borrowed ordinance to another system of laws. Our Constitution ordains that taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." [Art. 10, sec. 3.] But whilst that was in the former Constitution of California, it was stricken out of the one adopted in 1879. In a recent case in that State the Supreme Court, giving the reasons for the discrimination in the matter we are now discussing, said: "At the time the Constitution was framed and adopted it was supposed that the property of such corporations was commonly mortgaged to an amount equal to or greater than its value; the difficulty or impossibility of reaching their mortgage bonds when held, as is frequently the case, in the hands of numerous owners dispersed over the world, may have made it seem politic and convenient to fix them as an interest in the property; by taxing the property without deduction (on account of the debt) allowed to natural persons, the State could lose no revenue, nor could railroad property in anywise escape taxation, both of which contingencies were doubtless designed to be avoided; the plan was not open to the imputation of an attempt at double taxation." [Germania Trust Co. v. San Francisco, 128 Cal. 589.] Perhaps also the fact that the United States government, whose holdings could not be taxed, was a creditor to a large extent of the great railroad corporations of

that State, had considerable influence in shaping that clause in the constitutional convention.   In a dissenting opinion by VAN DYKE, J., in the case last above cited, it is said: "One of the controlling purposes of the people of this State, in calling that convention and by the adoption of the Constitution framed by such convention, was to compel the creditor class to bear a fair share of the burdens of taxation.... No plan, however, that may be devised will, in practice, operate entirely equal and uniform.   This fact was realized by members of the convention, as the debates will show.   Hence, the clause of the Constitution of 1849 declaring that 'taxation shall be uniform throughout the State,' was omitted from the present Constitution; and section 1 of the article on revenue and taxation, as first reported by the committee, declaring that 'all taxes shall be uniform upon the same class of subjects' was, after debate, stricken out."

These decisions show that when the clause was inserted in the California Constitution it was the deliberate purpose to discriminate between the holders of mortgage securities executed by natural persons and those holding such securities executed by "railroad and other quasi-public corporations;" they expressly cut out of their Constitution the rule of equality and uniformity, and, as their Supreme Court said when the question first came up for adjudication, the fact that the law did discriminate, requiring one class to pay more taxes "than is required to be paid upon like property by others" did not affect the validity of the law because in its power of taxation the State was supreme, and that the fourteenth amendment was no restriction in that case, because its protection was designed only for natural persons.   [C. P. R. R. v. Board of Equalization, supra.]   The letter and spirit of our Constitution, however, declare for uniformity and equality in taxation of the same kind of property under like circumstances, and this

amendment is out of harmony with the general tone of our organic law. Of course, it is no legal objection to the validity of an amendment to say that it is contrary to the pre-existing Constitution, for the very purpose of an amendment is to make some change in the original. But as we have copied this amendment from the Constitution of another State and the question is, does it create an arbitrary discrimination? it is proper in determining its intent and purposes, to contrast the general spirit of the two Constitutions and interpret this in the light of that Constitution from which it was borrowed, rather than in that of our own. Taking it, then, as meaning what the California courts say it means, and as what they say the debates in the constitutional convention show its framers avowed they intended it to mean, it creates the very invidious and arbitrary discrimination that appellants say it does. In none of the California decisions to which our attention has been called is there any distinction drawn between mortgages given by a railroad company on its roadbed and those covering lands held for sale; they are all treated alike. As we borrowed the text of the law from that State, we are presumed to take its interpretation there given.

There is a slight difference between the words employed in our amendment and those in the California law, and there is also a difference in the punctuation. The form of expression in the California law is: "A mortgage, deed of trust, contract or other obligation by which a debt is secured, shall for the purposes of assessment and taxation, be deemed and treated as an interest in the property afforded thereby. Except as to railroad and other quasi-public corporations, in case of debts so secured the value of the property affected," etc.

In our law it is: "A mortgage, deed of trust, contract or other obligation by which a debt is secured, shall, for the purposes of assessment and taxation, be deemed and treated as an

Russell v. Croy.

interest in the property affected thereby, except as to railroad and other quasi-public corporations, for which provision has already been made ,by law; in case of debts so secured, the value of the property affected," etc. It is contended in behalf of respondents that the words "for which provision has already been made by law," obviate the objection and sufficiently justify the discrimination. Those words it is contended refer "to the special provisions made in our statutes for the taxation of the railroad property absolutely essential to the operation of the road and to the performance of the functions and duties as a common carrier." [Brief of Attorney-General, p. 96.] But that would be an arbitrary construction, there is nothing in the context limiting the application of those words to that kind of railroad property. They were used without limit in reference to all railroad and other quasi-public corporations. Besides, the roadbed, rolling-stock, etc., was not the only kind of railroad property for which provision for taxation had already been made by law. At the time of the proposal or the adoption of that amendment, there were provisions already made in our laws not only for the taxation of the railroad structure and outfit as a carrier, but also of all its other property and also of all property in the State whether covered by mortgage or clear. The words are applicable to all mortgaged property of every class owned by "railroad or other quasi-public corporations." Besides, if the words were intended to refer only to that property of a railroad corporation which the State Board of Equalization assesses, still it does not alter the case, because there is no provision made in those statutes for separating the interest of the mortgagee from that of the mortgagor and taxing it as an interest in the property, and, hence, the discrimination in favor of these mortgagees against the holders of other mortgage securities is just as glaring as it would be if the provision already made by law had not been

made. And referring again to the California cases, we discover that they have the same system of railroad taxation there that we have. The State Board of Equalization assesses the railroad and its equipment as a whole, and distributes the amount pro rata through the counties just as we do, yet they hold that their Constitution exempts holders of securities covered by mortgages on all property owned by railroads. If we should be compelled to enforce this law in this State a further question not entirely free from difficulty might arise when we would be called on to say what corporations were to be understood as embraced in the term "other quasi-public corporations," for the holders of mortgages under all such are within the favored class. Judge VAN DYKE, in his opinion above quoted, says that it includes street railroads, irrigation and drainage, water and lighting corporations, and all that possess public franchises and deal with public utilities.

It is further contended in behalf of respondent that the unlawful discrimination (if such it be) is against the railroad corporations in requiring them to pay taxes on the value of their mortgaged property, without deducting the value absorbed by the mortgage, and that appellants are not concerned in that, and have no right to complain. But if the law is to be construed as not affording railroad corporations the equal protection of the laws and therefore invalid, the burden that it would lay on their shoulders they can not be compelled to carry, and as the law does not lay it on those who stand in relation to the railroad property as these appellants stand in relation to the property embraced in their mortgages, that interest goes untaxed, and the result is that the mortgage securities held by the appellants are made to bear a part of the burden of the State government, while the same kind of securities held by their neighbors are unburdened. And it puts mortgage securities issued by quasi-public corporations in a position of advan-

Russell v. Croy.

tage over such securities made by individuals, and thus, with no better security, so far as the value of the property pledged is concerned, than that covered by the mortgage made by the natural person or the private corporation, the money lender can afford to lend his money to a quasi-public corporation at a less rate of interest than to others. In this view the railroad corporation may receive compensation for the discrimination against it, and the invidious discrimination results in practice only between the smaller capitalist who lends money to the individual and the larger one who deals with railroad and other quasi-public corporations.

It is not denied that the State may classify property for taxation. And nothing said herein is to be understood as drawing in question or casting any doubt as to the validity of section 5, article 10, of our Constitution, relating to the taxation of railroad corporations, but we do mean to say the classification must rest on some reason other than mere ownership and that different pieces of property of the same kind, held and used for the same or similar purposes within the same jurisdiction, can not lawfully be so classified as that one is subjected to the tax and the other exempt, merely because one belongs to a natural person and the other to a corporation, or that one is the obligation of a corporation and the other that of a natural person, or one that of a large concern and the other that of a small one.

In Santa Clara Co. v. S. Pac. Ry., supra, it is said: "A natural person and a railroad company may own together a parcel of property in equal proportions, subject to a mortgage. In estimating the value of the undivided half belonging to the natural person, half of the amount of the mortgage is deducted. In estimating the value of the undivided half belonging to the railroad company, no part of the mortgage is deducted. The discrimination is made against the company for no other rea-

son than its ownership. . . . . The principle which justifies such a discrimination in assessment and taxation, where one of the owners is a railroad corporation and the other a natural person, would also sustain it where both owners are natural persons. A mere change in the State Constitution would effect this if the Federal Constitution does not prohibit it.    Any difference between the owners, whether of age, color, race or sex, which the State might designate, would be a sufficient reason for the discrimination."    And again, referring to the protection afforded by the fourteenth amendment, the court said: "It implies not only that the means which the laws afford for such security shall be equally accessible to him, but that no one shall be subject to any greater burdens or charges than such as are imposed upon all others under like circumstances. . . . . Unequal taxation, so far as it can be prevented, is, therefore, with other unequal burdens, prohibited by the amendment. . . . Absolute equality may not be attainable, but gross and designed departures from it will necessarily bring the legislation authorizing it within the prohibition."

The opinion of Mr. Justice FIELD in that case is very elaborate.    It seems to furnish a conclusive answer to every proposition advanced by respondents in defense of this law, and we are satisfied with the soundness of its reasoning and the correctness of its conclusion.

In Northern Pacif. R. Co. v. Walker, 47 Fed. R. 681, the converse of the proposition in the California case was before the court, and was shown to be equally true.    The railroad company owned large quantities of land in Dakota; an act of the Legislature of Dakota Territory had provided that in lien of all other taxes on railroad property a certain tax on its gross earnings should be levied and upon payment thereof its property otherwise be exempt. The railroad company sued to enjoin the county officials

from collecting taxes assessed against its lands. The cause came before CALDWELL and THOMAS, JJ., in the United States circuit court for that district. The court, in its opinion by CALDWELL, J., said: "It will thus be seen that, while the plaintiff railroad is taxed on its gross earnings, the lands belonging to the company are not taxed at all. . . . . . . Lands, by whomsoever owned, are subject to taxation, by a uniform rule according to their value. . . . . But it is said the Legislature in the exercise of its powers to select the subjects of taxation and classify property for taxation, 'may place railroads in a class by themselves, and tax them and their property different from other persons; the only limitation being that all railroads in the same class must be taxed alike.' But, as before stated, conceding that under the organic act railroads may be classed by themselves for purposes of taxation, and taxed by a method applicable to them alone, still that classification and method of taxation must be restricted to what is railroad property. It can not be extended to lands which have no relation to the railroad, or its use or operation. The franchises of railroad companies, and their earnings, and railroad property, as before defined, may well be classed by themselves for purposes of taxation, and taxed by a different method or rule, from that applied to other property. This may be done because it is unlike other property. . . . . . Property of the same kind, in the same condition, and used for the same purpose, must be taxed by a uniform rule without regard to its ownership. . . . . It was not competent for the Legislature, either under the organic act, or the fourteenth amendment of the Constitution of the United States, to classify the lands in the Territory, for purposes of taxation, into lands owned by railroad companies and lands owned by all other persons, and declare that the former should not and the latter should be taxed."

In a late treatise on the Fourteenth Amendment, which

has been received with marked approbation by the profession, the author says: "Indeed, in one of the early cases, the extreme statement was made that 'the Federal Constitution imposes no restraints on the States' in regard to unequal taxation. If this language means that the amendment does not prohibit legitimate classification, and that it does not require all kinds of property to be taxed at the same rate, the statement is correct. Certain kinds of property and certain classes of persons can be singled out for taxation, even though this may result in exempting other property and other classes from any tax burden. But the statement is too broad, and is misleading. Unequal taxes may not be imposed upon property of the same kind, in the same condition and used for the same purposes. 'Equality is of the very essence of the taxing power itself.' The fourteenth amendment does impose a practical and effective restraint against such taxes." [Guthrie on Fourteenth Amendment, pp. 117-118.]

If in the case at bar we could limit the operation of the discriminating clause to property owned and used by a railroad company in its equipment as a common carrier, as the Attorney-General in his brief has with great force endeavored to do, we might find in such classification a justification for the act. But the language of the amendment justifies no such restriction. It covers not only all property of every description the title to which is in a railroad company, but also all property owned by other quasi-public corporations, and it is so interpreted by the State from which we borrowed it.

Our judgment is that the third constitutional amendment adopted at the election in November, 1900, is in violation of the fourteenth amendment of the Constitution of the United States, and therefore void.

The judgments are reversed and these causes are remanded to the Buchanan Circuit Court with directions to en-

ter judgment for the plaintiffs in both cases as prayed.

As to paragraph I, *Brace, Marshall* and *Gantt, JJ.,* concur; *Burgess, C. J.,* and *Sherwood* and *Robinson, JJ.,* dissent.

As to paragraph II, *Burgess, C. J.,* and *Robinson, Brace, Marshall* and *Gantt JJ.,* concur; *Sherwood, J.,* expresses no opinion.

As to paragraph III, *Robinson, Brace* and *Gantt, JJ.,* concur; *Burgess, C. J.,* and *Sherwood* and *Marshall, JJ.,* dissent.