SAMUEL G. McCONAUGHY v. SECRETARY OF STATE[1]

January 8, 1909.

Nos. 15,823—(25).

**Amendments to Constitution.**

The legislature of 1905 proposed to the people of the state for their approval or rejection two amendments to the constitution, one commonly known as the "tax amendment," and the other as the "good roads amendment." The two amendments were voted on at the general election held November 6, 1906. On December 21 the state canvassing board found from the returns submitted to it, and certified, that the tax amendment had been adopted and the good roads amendment defeated. The Governor, as required by law, then proclaimed that the tax amendment had been duly adopted and become part of the constitution of the state.

Thereafter a contest of the declared result was instituted in the district court by an elector, as authorized by the statute, and inspectors were appointed, who inspected the ballots cast on the two amendments in 654 of the 2,670 voting districts in the state. No effort was made to inspect the ballots in 1,945 districts. The court found that the tax amendment had been lost and the good roads amendment adopted. In order to reach this conclusion it was assumed that a uniformity of error had been established, due to the transposition of the amendments on the ballots and tally sheets, whereby votes cast for the good roads amendment were counted for the tax amendment, and votes cast for the tax amendment were counted for the good roads amendment, and that the errors disclosed in the recounted districts would continue throughout all the districts in the state.

On appeal it was also contended that the contestant, after having recounted the ballots in certain districts and disclosed errors sufficient to overcome the declared majority in favor of the tax amendment, might rest and rely upon the declared vote in the remaining districts. *Held*:

**Decision not Supported by Findings.**

(a) That the conclusions of law are not justified by the findings of fact.

**Jurisdiction of Courts.**

(b) The courts of this state have jurisdiction to determine whether a constitutional amendment has been legally submitted to and adopted by the people.

[1] Reported in 119 N. W. 408.

**Political Question—Legal Question.**

(c) Whether a constitution shall be amended is a political question. Whether it has been legally amended is a judicial question.

**Certificate of State Canvassing Board not Conclusive.**

(d) The statement and certificate of the state canvassing board and the proclamation of the Governor that a proposed amendment to the constitution has been adopted is not final and conclusive upon the judicial department of the government.

**Statutory Procedure Adequate.**

(e) The statutory procedure for contesting the declared result of a popular vote on the adoption or rejection of a proposed amendment to the constitution is adequate for the purpose.

**Contest a Search for Truth.**

(f) A contest of this character is not in a strict legal sense an adversary proceeding. It is more in the nature of an investigation for the purpose of discovering the truth, in which no one individual has any direct personal interest antagonistic to the general public. It must be conducted in the manner required by the statute, and an orderly proceeding requires that the general rules regulating the production of evidence shall be observed. But it is not necessary or desirable that every technical rule of evidence shall be observed with extreme nicety, nor should the result, in a matter of such public importance, be determined by a nice balancing of presumptions and probabilities.

**Evidence Insufficient to Warrant Presumption.**

(g) In this proceeding the contestant sought to overthrow the result of the election in the state as declared by the state board of canvassers and proclaimed by the Governor. He alleged errors in every voting district in the state, due to a cause which operated in every district, and offered evidence which overthrew the declared result in certain precincts only. The findings of fact made by the trial court did not justify the inference that the errors against the tax amendment would continue throughout the uncounted districts.

**Certificate of State Canvassing Board—Presumption.**

(h) The controlling presumption in this proceeding is that which arises from the statement and certificate of the state canvassing board. In a collateral proceeding this certificate is conclusive, and in a direct attack it can be overthrown only by very clear and satisfactory evidence. The burden throughout was upon the contestant. The correctness of the certificate of the state board depended upon the result of the total vote in the state, regardless of the shifting results in particular precincts. It could be determined only by a recount of the entire vote, or of such a proportion thereof that, even if all the remaining votes were counted one way, it could not affect the final result.

By chapter 168, Laws 1905, the legislature proposed an amendment to article 9 of the constitution to take the place of sections 1, 2, 3, 4 and the amendment added in 1896, the proposed amendment being commonly called the tax amendment. By chapter 212, Laws 1905, the legislature proposed an amendment to section 16 of article 9 of the constitution, commonly called the good roads amendment. These amendments were submitted to popular vote at the general election in November, 1906. The state canvassing board found from the returns that 156,051 votes had been cast for the tax amendment and declared that amendment carried, and the Governor made his proclamation thereof. The same board found that 141,870 votes had been cast for the good roads amendment and declared this amendment failed of adoption. On December 31, 1906, Samuel G. McConaughy served notice of appeal to the district court for St. Louis county, with points of contest, upon the secretary of state, and on the same day F. A. Watkins served notice of appeal to the district court for Carlton county, with points of contest, upon the secretary of state. The ground of the McConaughy contest was that the order in which the amendments named were printed in small type on the official books and tally sheets was not the same as the order in which they were printed on the official ballot, and that in consequence of such inverted order the votes were erroneously canvassed and returned, and that if corrected the tax amendment was lost. The ground of the Watkins contest was the same, and he alleged that in consequence the good roads amendment was carried. This contest was transferred to the district court for St. Louis county, and the two proceedings were consolidated and tried together.

Inspectors were appointed to inspect the ballots and they counted the ballots in 654 election districts and in all about 141,000 ballots; they found the ballots in 71 additional election districts had been lost or destroyed; in 65 election districts ballots counted by the inspectors were withdrawn at the trial, and it was stipulated that 470 ballots not received in evidence should be counted as that many votes in favor of the tax amendment and as that many votes against the good roads amendment. The inspectors counted some ballots from 73 out of the 83 counties in the state, but not all the ballots in any one county were counted.

Both proceedings were heard before Dibell, J., who made findings of fact that because the two amendments did not appear in the same order on the tally sheets and the official ballot many mistakes and errors were made by the election officers in reporting and recording the votes upon the amendments, whereby more votes were counted for the tax amendment than were cast therefor and fewer votes were counted for the good roads amendment than were cast therefor. As conclusions of law he found that a majority of all electors of the state voting at the election of November, 1906, did not vote for or ratify the tax amendment, and that a majority of such electors did vote for and ratify the good roads amendment. "No record of the proceedings in the lower court has been made," and the case was "submitted solely on the findings of the trial judge." From the judgment entered pursuant to the order for judgment, the state appealed. Reversed.

*Edward T. Young,* Attorney General, and *George T. Simpson,* Assistant Attorney General, for the State.

The adoption of a constitution or an amendment thereto is a political act performed by the people as a body politic. Neither the courts nor any other branch of the government can question the action of the people in adopting their constitution. The thing created cannot in the very nature of things pass upon the existence of its creator. Luther v. Borden, 7 How. 1, 34; Miller v. Johnson, 15 L. R. A. 524; Andrews v. Page, 50 Tenn. 653, 659.

. The district court erred in making and filing its order and judgment herein for the reason that the statute under which it assumed so to do is void for vagueness, incompleteness and uncertainty: (a) There are no adversary parties; the application to the district court by the contestant is ex parte, and there is no provision for representation by the people of the state. (b) No provision is made therein for the preservation of the ballots cast on the constitutional amendments either before or after the statutory inspection thereof. (c) The district court in such a contest has no one before it as contestee upon whom its judgment can operate.

*H. H. Phelps, C. O. Baldwin,* and *William W. Billson,* for respondents.

The judiciary is the proper authority to determine whether the proposed amendment is part of the constitution. Luther v. Borden, 7 How. 1; Miller v. Johnson, 15 L. R. A. 524, and note; Koehler v. Hill, 60 Iowa, 543; Dayton v. City of St. Paul, 22 Minn. 400; State v. Stearns, 72 Minn. 200. The passage of Laws 1907, c. 477, indicates the members of the legislature were satisfied the tax amendment had not been carried.

The statute providing for contest is ample. The state is made a party by serving notice on the secretary of state. In such a case the court enters a decree adjudging that one of the amendments has carried or did not carry. It issues no process against anybody to enforce the decree, but in any litigated case the courts of the state take judicial notice of the decree.

The inspectors counted and handled 124,659 ballots in the precincts that were received in evidence. It is not a fair comparison of relative proportions to compare the number of precincts counted with the entire number in the state—in some instances running up to 500 votes in a precinct—in some as low as from 5 to 10 in a precinct.

The return of a precinct not recounted should be considered conclusive. Brown v. Crosson, 115 Iowa, 256; McCreary, Ele. (4th Ed.) § 431; Case of Kneass, 2 Parsons Eq. Cas. 553, 584; Paine, Ele. 759; State v. Donnewirth, 21 Oh. St. 216; Powers v. Reed, 19 Oh. St. 189; Taylor v. Taylor, 10 Minn. 81 (107); Merkley v. Trainor, 142 Cal. 265; Eakin v. Campbell, 10 N. D. 416.

The entire election will be rejected when the result is rendered unreliable. Paine, Ele. 596; Mann v. Cassidy, 1 Brew. 11, 60; Thompson v. Ewing, Id. 67; Weaver v. Given, Id. 140; People v. Tool, 35 Colo. 225; McCreary, Ele. § 582a; 5 Current Law, 1073, § 10.

ELLIOTT, J.

This appeal from a judgment entered in the district court of St. Louis county presents questions of very great importance and the results of the decision will be very far-reaching. It will determine the power of the legislature over methods of taxation, and thus vitally affect the future development of the commonwealth and the individual interests

of every citizen. As the constitution stood from the organization of the state, all taxes were required to be raised under the system known as the general property tax. Dissatisfaction with the results of this method and the development of more scientific and satisfactory methods of raising revenue induced the legislature to submit to the people an amendment to the constitution which provided merely that taxes shall be uniform upon the same class of subjects. This proposed amendment was submitted at the general election held in November, 1906, and in due time it was certified by the state canvassing board and proclaimed by the Governor as having been legally adopted. Acting upon the assumption that the amendment had become a part of the constitution, the legislature enacted statutes providing for a state tax commission and a mortgage registry tax, and the latter statute, upon the same theory was held constitutional by this court in Mutual Ben. Life Ins. Co. v. County of Martin, 104 Minn. 179, 116 N. W. 572. The district court found that the amendment had not in fact been adopted, and on this appeal we are required to determine the correctness of that conclusion.

1. The legislature proposed to the people of the state for their approval or rejection a certain amendment to article 9 of the constitution, which, when adopted, was to be known as section 1 of said article 9, and to be as follows:

"Section 1. The power of taxation shall never be surrendered, suspended or contracted away. Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes, but public burying grounds, public schoolhouses, public hospitals, academies, colleges, universities, and all seminaries of learning, all churches, church property, and houses of worship, institutions of purely public charity, and public property used exclusively for any public purpose, shall be exempt from taxation, and there may be exempted from taxation personal property not exceeding in value $200 for each household, individual or head of a family, as the legislature may determine:

Provided, that the legislature may authorize municipal corporations to levy and collect assessments for local improvements upon property benefited thereby without regard to a cash valuation, and, provided further, that nothing herein contained shall be construed to affect, modi-

fy or repeal any existing law providing for the taxation of the gross earnings of railroads." (Laws 1905, p. 216, c. 168.)

This proposed amendment will be referred to as the "tax amendment."

By chapter 212, p. 280, of the laws of Minnesota for the year 1905, the legislature also proposed to the people of the state for their approval or rejection a certain amendment to section 16 of article 9 of the constitution of the state, so that said section 16, when amended, should read as follows:

"Section 16. For the purpose of lending aid in the construction and improvement of public highways and bridges, there is hereby created a fund, to be known as the 'state road and bridge fund,' said fund shall include all moneys accruing from the income derived from investments in the internal improvement land fund, or that may hereafter accrue to said fund, and shall also include all funds accruing to any state road and bridge fund, however provided. The legislature is authorized to add to such fund, for the purpose of constructing or improving roads and bridges of this state, by providing, in its discretion, for an annual tax levy upon the property of this state of not to exceed in any year one-fourth ($1/4$) of one mill on all the taxable property within the state.

Provided, that no county shall receive in any year more than three (3) per cent. or less than one-half ($1/2$) of one (1) per cent. of the total fund thus provided and expended during such year; and provided, further, that in no case shall more than one-third ($1/3$) of the cost of constructing or improving any road or bridge be paid by the state from such fund."

This proposed amendment will be referred to as the "good roads amendment."

These two proposed tax amendments were submitted to the people of the state for their approval or rejection at the general election held on November 6, 1906. At this election 284,366 votes were cast. On December 21, 1906, the state canvassing board found from the returns submitted to it that 156,051 of the electors of the state voting at the election had voted for the tax amendment, and thereupon it declared that the tax amendment had been adopted by a majority of 13,568 votes. On December 27, 1906, the Governor of the state made his proclamation of the fact, as required by law. On December 21, 1906,

the state canvassing board on the returns submitted to it also found that 141,870, and no more, of the electors of the state voting at the general election of 1906, had voted for the good roads amendment, and thereupon declared that the good roads amendment lacked 313 votes of being adopted.

Both amendments were submitted throughout the state as required by law upon a separate pink ballot, and the result of the ballots cast thereon was likewise counted upon separate pink tally sheets. On the ballots the good roads amendment appeared as No. 1, and the tax amendment as No. 2. No. 3 was an amendment which is in no wise involved in the present matter. On the tally sheets the tax amendment was printed first and the good roads amendment second, in order. At the time of the election there were 83 counties in the state, divided into 2,670 election districts.

On December 31, 1906, the contestant, Samuel G. McConaughy, served upon the secretary of state a notice of contest, in which it was alleged that the tally books and tally sheets used in each precinct at the general election of 1906 had printed thereon the so-called tax amendment as the first in order, and the so-called good roads amendment as the second in order, and that on the official ballots used at the election the good roads amendment appeared first and the tax amendment second in order, and that by reason of such transposition many ballots cast for or against the good roads amendment were by mistake counted and returned as having been cast in favor of or against the tax amendment, and that many of the ballots cast for or against the tax amendment were by mistake counted for or against the good roads amendment; that of the votes of the electors voting at said election a majority of the same were not cast in favor of the adoption of the tax amendment, and that in fact the tax amendment had been thereby rejected, but that a majority of the votes of the electors voting at the election had been cast in favor of the good roads amendment and that the same had been thereby adopted. By the filing of the points of contest and notice of appeal with the secretary of state the contestant attempted to institute a contest and to appeal to the district court, under the provisions of sections 336 and 337, R. L. 1905, from the determination of the state board of canvassers as to the adoption of the tax amendment and the

proclamation of the Governor of the state declaring the same a part of the constitution of the state.

A similar contest was entered and appeal taken from the finding that the good roads amendment had not been adopted. The notices of appeal and points of contest were delivered by the secretary of state to the attorney general.

In January, 1907, the district court, under the provisions of sections 336 and 337, R. L. 1905, appointed inspectors to inspect the ballots cast on the constitutional amendments at said election, and thereafter the inspectors examined and counted the ballots in 654 of the election districts out of the 2,670 election districts in the state, and in six months' time counted in all about 141,000 of the ballots cast on the good roads and tax amendments. The inspectors also endeavored to count the ballots in 71 of the other election precincts of the state, but were unable to do so for the reason that the ballots therein had been lost or destroyed. No effort was made to inspect or count the ballots in the remaining 1,945 voting districts of the state, and no ballot evidence was offered before the court with reference to those precincts. The inspectors appointed by the court endeavored to count ballots in all of the counties of the state except two, but not all of the ballots in any one county were counted.

When the matter came on for hearing before the district court, the attorney general appeared and objected to the jurisdiction of the court and to the proofs. This objection was overruled, and the court found upon the evidence submitted to it that the total number of affirmative votes for the tax amendment in the state was 140,714. This conclusion was reached by taking the return of the state canvassing board as to the precincts of the state which were not recounted by the inspectors, and finding therefrom that 83,349 votes had been cast therein in favor of said tax amendment, adding this to the vote from the precincts which were recounted and the recount received in evidence, which amounted to 57,365. By this method it appeared that the tax amendment failed of ratification by 1,470 votes.

By the same process the court also found that there had been cast 157,377 votes for the good roads amendment; that is, by taking the returns as fixed by the state canvassing board in the precincts which were not recounted, and finding therefrom that 79,427 affirmative votes had

been cast for said good roads amendment, and adding thereto the 77,-950 affirmative votes which the court found from the returns of the inspectors had been cast by the electors in the precincts recounted as in favor of said good roads amendment, it found that the said good roads amendment had been carried by a majority of 15,193. Judgment was ordered in each case in accordance therewith, and separate appeals were taken by the state from the judgments so entered. We, for the present, consider only the appeal from the judgment entered in the tax amendment proceeding.

2. At the threshold of the case we are met with the assertion that the questions involved are political, and not judicial. If this is correct, the court has no jurisdiction as the certificate of the state canvassing board would then be final, regardless of the actual vote upon the amendment. The question thus raised is a fundamental one; but it has been so often decided contrary to the view contended for by the attorney general that it would seem to be finally settled. That the courts have jurisdiction to determine whether proposed amendments to the constitution have been legally adopted was assumed in Dayton v. City of St. Paul, 22 Minn. 400, Secombe v. Kittelson, 29 Minn. 555, 12 N. W. 519, and State v. Stearns, 72 Minn. 200, 75 N. W. 210; but, as the power of the court seems not to have been heretofore seriously questioned in this state, it has seemed advisable to consider the question somewhat carefully.

(a) An examination of the decisions shows that the courts have almost uniformly exercised the authority to determine the validity of the proposal, submission, or ratification of constitutional amendments. It has been judicially determined whether a proposed amendment received the constitutional majority of votes (Dayton v. City of St. Paul, supra; Rice v. Palmer, 78 Ark. 432, 96 S. W. 396; Bott v. Wurts, 63 N. J. L. 289, 43 Atl. 744, 881, 45 L. R. A. 251; State v. Foraker, 46 Oh. St. 677, 23 N. E. 491, 6 L. R. A. 422; Tecumseh v. Saunders, 51 Neb. 801, 71 N. W. 779; Green v. State, 5 Idaho, 130, 47 Pac. 259, 95 Am. St. 169; In re Denny, 156 Ind. 104, 59 N. E. 359, 51 L. R. A. 722; Knight v. Shelton [C. C.] 134 Fed. 423); whether a proposed amendment is a single amendment, within the constitutional requirement that every amendment must be separately submitted (State v. Powell, 77

106 M.—26

Miss. 543, 27 South. 927; Gabbert v. Chicago, 171 Mo. 84, 70 S. W. 891; State v. Timme, 54 Wis. 318, 11 N. W. 785; In re Denny, supra; Lobaugh v. Cook, 127 Iowa, 181, 102 N. W. 1121; People v. Sours, 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34; State v. Board, 34 Mont. 426, 87 Pac. 450; State v. Winnett, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. [N. S.] 149); whether the failure to enter the resolution of submission upon the legislative journals invalidates the amendment (Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; Oakland v. Hilton, 69 Cal. 479, 11 Pac. 3; West v. State, 50 Fla. 154, 39 South. 412; Durfee v. Harper, 22 Mont. 354, 56 Pac. 582; State v. Tufly, 19 Nev. 391, 12 Pac. 835, 3 Am. St. 895); whether the description of the amendment and the form of the ballot are sufficient (Russell v. Croy, 164 Mo. 69, 63 S. W. 849; State v. Winnett, supra; Murphy v. Attorney General, 148 Mich. 563, 112 N. W. 127); whether the method of submission is sufficient (Lovett v. Ferguson, 10 S. D. 44, 71 N. W. 765; Russell v. Croy, 164 Mo. 69, 63 S. W. 849); whether the publication of the amendment or of a notice relative to it is sufficient (Com. v. Griest, 196 Pa. St. 396, 46 Atl. 505, 50 L. R. A. 568; Russell v. Croy, 164 Mo. 69, 63 S. W. 849); whether the submission may be as well by resolution as by a legislative act approved by the executive (Com. v. Griest, supra; Warfield v. Vandiver, 101 Md. 78, 60 Atl. 538; Edwards v. Lesueur, 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815; Hays v. Hays, 5 Idaho, 154, 47 Pac. 732; State v. Dahl, 6 N. D. 81, 68 N. W. 418, 34 L. R. A. 97); at what election the amendment must be submitted (People v. Curry, 130 Cal. 82, 62 Pac. 516).

In Rich v. Board, 100 Mich. 453, 458, 59 N. W. 183, the court said: "It is contended that the determination of the question whether an amendment to the constitution has been carried involves the exercise of political, and not judicial, power. If this be so, it follows that the promulgation of any purported amendment by the executive or any executive department is final, and that the action cannot be questioned by the judiciary. But, with reference to the conditions precedent to submitting a proposed amendment to a vote of the people, it has been repeatedly held, by courts of the highest respectability, that it is within the power of the judiciary to inquire into the question, even in a collateral proceeding. * * * It is to be noted that, under section 1 of article 20 of the constitution of the state, no amendment can become a part of

the constitution until ratified by a vote of the people. One prerequisite is equally as essential as the other. The amendment must first receive the requisite majority in the legislature, and afterwards be adopted by the requisite vote. * * * It is the fact of a majority vote which makes the amendment a part of the constitution."

In considering the cases it is necessary to note whether in the particular case the court was called upon to determine between rival governments, or whether the legislature, or some board or official, had legally performed the duty imposed by the constitution or statutes.

In State v. McBride, 4 Mo. 303, 29 Am. Dec. 636, it was held that the general assembly, under the power granted by the constitution, could change the constitution only in the manner prescribed by it, and that it was the duty of the court to determine whether all prerequisites had been complied with. In Collier v. Frierson, 24 Ala. 100, it was held that a constitution can be changed only by the people in convention or in a mode described by the constitution itself, and that if the latter mode is adopted every requisite of the constitution must be observed. "It has been said," says the court, "that certain acts are to be done—certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the legislature or any other department of the government can dispense with them? To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

In State v. Swift, 69 Ind. 505, 518, it was said that: "The people of a state may form an original constitution, or abrogate an old one and form a new one, at any time, without any political restriction except the constitution of the United States; but if they undertake to add an amendment, by the authority of legislation, to a constitution already in existence, they can do it only by the method pointed out by the constitution to which the amendment is to be added. The power to amend a constitution by legislative action does not confer the power to break it, any more than it confers the power to legislate on any other subject, contrary to its prohibitions." So, in State v. Timme, 54 Wis. 318, 11 N. W. 785, it was held that no amendments can be made to the con-

stitution of the state without a compliance with the provisions thereof, both in the passage of such amendment by the legislature and the manner of submitting it to the people. The courts have not all agreed as to the strictness of compliance which should be required.

In the Prohibition and Amendment Case, 24 Kan. 700, the court determined judicially whether an amendment to the constitution had been legally adopted. After approving the statement quoted from Collier v. Frierson, supra, that "we entertain no doubt that, to change the constitution in any other mode than by a convention, every requisite which is demanded by the instrument itself, must be observed, and the omission of any one is fatal to the amendment," the court held that as "substance of right is grander and more potent than methods and forms," there had been substantial compliance with the constitutional requirement that a proposed amendment to the constitution must be entered at length on the legislative journal. It appears that the joint resolution making a submission simply provided that a proposition should be submitted to the electors at the general election of 1880. It did not declare that the machinery of the general election law should control, or that any particular officers' or board would receive, count, or canvass the votes cast. But the existing election machinery was adequate, and the votes were received, counted, and canvassed, and the result declared as fully as though it had been in terms so ordered. These methods had been followed in the adoption of previous amendments, and it was held that, conceding the irregularity of the proceedings of the legislature and the doubtful scope of the provisions for the election, yet in view of the very uncertainty of such provisions, the past legislative history of similar propositions, the universal prior acquiescence in the same forms of procedure, and the popular and unchallenged acceptance of the legal pendency before the people of the question of the amendment for decision, and in view of the duty cast upon the court of taking judicial knowledge of anything affecting the existence and validity of any law or portion of the constitution, it must be adjudged that the proposed amendment became a part of the constitution. The effect was to hold that a provision of the constitution requiring the proposed amendment to be entered in full on the journals was directory, and not mandatory. This liberal view was approved in State v. Winnett, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. (N. S.) 149, and People v.

Sours, 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34. But it has not been universally accepted.

In Oakland v. Hilton, 69 Cal. 479, 497, 11 Pac. 3, the court, in commenting upon the Kansas case said: "The reasoning by which the learned court reached the conclusion it did is not based on any sound legal principles, but contrary to them. Neither the argument nor the conclusion can command our assent or approval. The argument is illogical, and based on premises which are without any sound foundation, and rest merely in assumption." See also the well-considered case of Kadderly v. Portland, 44 Ore. 118, 74 Pac. 710, 75 Pac. 222.

All these cases concede the jurisdiction of the court to determine whether, in submitting a proposed amendment to the people, the legislature legally observed the constitutional provisions as to the manner of procedure. In Livermore v. Waite, 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312, the court, at the instance of a citizen and a taxpayer, restrained the secretary of state from taking steps to submit to the people a proposed amendment to the constitution agreed to by the legislature on the ground that the legislature had not acted in conformity with the constitution and that the proposed amendment was of such a character that it could not properly become a part of the constitution. The supreme court of Colorado, in People v. Sours, supra, refused to exercise this authority.

The entire question received elaborate consideration in Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609. The amendment, which concededly had been adopted by the people, had not, before its submission, been entered in full upon the legislative journals, as required by the constitution, and it was held that this was a material variance in both form and substance from the constitutional requirements, and that the amendment did not, therefore, become a part of the constitution.

As to the claim that the question was political, and not judicial, it was said that, while it is not competent for courts to inquire into the validity of the constitution and the form of government under which they themselves exist, and from which they derive their powers, yet, where the existing constitution prescribes a method for its own amendment, an amendment thereto, to be valid, must be adopted in strict conformity to that method; and it is the duty of the courts in a prop-

er case, when an amendment does not relate to their own power or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed, and, if not, to declare the amendment invalid and of no force. This case was followed in State v. Brookhart, 113 Iowa, 250, 84 N. W. 1064.

In University v. McIver, 72 N. C. 76, the question whether a proposed amendment to the constitution had been legally adopted was treated as a judicial question. By the constitution a proposed amendment was required to be approved by two legislatures before its submission to the people. In this instance a bill was passed which contained seventeen amendments. The next legislature rejected nine and adopted eight of these amendments, and submitted them to the people. The majority of the people voted for their adoption; but it was contended that the constitution contemplated and required that the same bill and the same amendments, without change, should be approved by both legislatures, and that it did not follow that, because the second legislature adopted separately eight out of the seventeen amendments adopted by the first legislature, it would have adopted the seventeen, or any of them, if they had been voted upon by the second in the form adopted by the first body. The substance of the contention was that there had not been a concurrence of the two legislatures on the same amendments, according to the letter and spirit of the constitution. The court held that the power of the legislature in submitting amendments could not be distinguished from the powers of the convention, and that, as the people had spoken and ratified the amendments, they became a part of the constitution.

In Westinghausen v. People, 44 Mich. 265, 6 N. W. 641, it was held that prior to 1876 a proposed amendment to the constitution could not be submitted to the people at any other than a general election; but, as the amendment under consideration had been submitted after the constitution had been changed, it had been legally submitted and adopted.

In State v. Powell, 77 Miss. 543, 27 South. 927, the question whether an amendment to the constitution had been legally submitted and adopted by the people was held to be judicial, and not political, in its nature. The amendment under consideration changed the constitution by providing for an elective, instead of an appointive, judi-

ciary. It was contended that the amendments had been improperly submitted, and not adopted by a majority of the qualified voters voting at the election, as required by the constitution. The law did not direct how the result of the election should be determined. The legislature by joint resolution recited that the election had been duly held throughout the state, and, as it appeared from the returns made to the secretary of state that 21,169 votes were cast in favor of, and 8,643 votes against, the amendment, it resolved "that said amendment be, and is hereby, inserted in the constitution of the state of Mississippi as a part of said constitution." In fact, the amendment was not submitted in the manner prescribed by the constitution, and it did not receive a majority of all the qualified voters voting at the election.

It was argued that the rules prescribed by the constitution "are all for the guidance of the legislature, and from the very nature of the thing the legislature must be the exclusive judge of all questions to be measured or determined by those rules; whether the question be political and certainly a legislative one, or judicial to be determined by the courts, this section of rules, not only of procedure but of final judgment as well, confides to the separate magistracy of the legislative department full power to hear, consider, and adjudge that question. The legislature puts the question to the qualified electors. The qualified electors answer back to the legislature. 'If it shall appear' to the legislature that its question has been answered in the affirmative, the amendment is inserted and made a part of the constitution. The Governor and the courts have no authority to speak at any stage of this proceeding between the sovereign and the legislature, and when the matter is thus concluded it is closed, and the judiciary is as powerless to interfere as the executive." But it was held that the question whether the proposition submitted to the voters constituted one, or more than one, amendment, whether the submission was according to the requirements of the constitution, and whether the proposition was in fact adopted, were all judicial, and not political, questions. "We do not," said Chief Justice Whitfield, "seek a jurisdiction not imposed upon us by the constitution. We could not, if we would, escape the exercise of that jurisdiction which the constitution has imposed upon us. In the particular instance in which we are now acting, our duty to know what the constitution of the state is, and in ac-

cordance with our oaths to support and maintain it in its integrity, imposed on us a most difficult and embarrassing duty, one which we have not sought, but one which, like all others, must be discharged."

In Bott v. Wurts, 63 N. J. L. 289, 293, 43 Atl. 744, 881, 45 L. R. A. 251, it was held that it was the duty of the judicial department of the government to determine whether the legislative department or its officers had observed the constitutional injunctions in attempting to amend the constitution, and to annul their acts if they had not done so. The case is an interesting and well-considered one. The constitution provided the manner in which proposed amendments should be submitted to the people, but did not provide a method for canvassing the votes. The legislature, having agreed to certain proposed amendments, passed an act for submitting the same to the people. This statute provided for the transmission to the secretary of state of certificates showing the result of the voting throughout the state, and made it the duty of the Governor at the designated time to summon four or more senators, who, with the Governor, should constitute a board of state canvassers to canvass and estimate the votes for and against each amendment. This board was to determine and declare which of the proposed amendments had been adopted and to deliver a statement of the results to the secretary of state, and "any proposed amendment which, by said certificate and determination of the board of canvassers, shall appear to have received in its favor a majority of all the votes cast in the state for and against said proposed amendment shall, from the time of filing such certificate, be and become an amendment to and a part of the constitution of this state; and it shall be the duty of the Governor of this state forthwith, after such determination, to issue a proclamation declaring which of said proposed amendments have been adopted by the people." This board was required to file a statement of the result of the election, and the Governor to issue his proclamation declaring that the amendment had been adopted and become a part of the constitution. At the instance of a taxpayer the supreme court allowed a writ of certiorari to remove into the court for review the statement of the results of the election made by the canvassing board, in order that it might be judicially determined whether on the facts shown in that statement the board had legally determined that the proposed amendment had been adopted. The supreme court de-

cided that the concurrence of the board of state canvassers and the executive department of the government in their respective official functions placed the subject-matter beyond the cognizance of the judicial department of the state. The court of appeals, after a full review of the authorities, reversed this decision, and held that the questions were of a judicial nature, and properly determinable by the court on their merits. Mr. Justice Dixon, after stating the facts, said:

"It thus becomes manifest that there was present in the supreme court, and is now present in this court, every element tending to maintain jurisdiction over the subject-matter, unless it be true, as insisted, that the judicial department of the government has not the right to consider whether the legislative department and its agencies have observed constitutional injunctions in attempting to amend the constitution, and to annul their acts, in case they have not done so. That such a proposition is not true seems to be indicated by the whole history of jurisprudence in this country." The court, after considering the case on the merits, held that the proper conclusion had been drawn therefrom, and that the amendment in question was legally submitted and adopted.

The recent case of Rice v. Palmer, 78 Ark. 432, 440, 96 S. W. 396, presented the identical question which we have under consideration. In reference to the contention that the constitution intended to delegate to the Speaker of the House of Representatives the power to determine whether an amendment had been adopted, and that the question was political, and not judicial, the court observed: "This argument has often been made in similar cases to the courts, and it is found in many dissenting opinions, but, with possibly a few exceptions, it is not found in the prevailing opinion."

In State v. Tooker, 15 Mont. 8, 37 Pac. 840, 25 L. R. A. 560, it was held that the constitutional requirement of publication of a proposed constitutional provision for three months prior to the election at which it is to be submitted to the people is mandatory, and that noncompliance therewith renders the adoption of an amendment of no effect.

The authorities are thus practically uniform in holding that whether a constitutional amendment has been properly adopted according to the requirements of an existing constitution is a judicial question.

There can be little doubt that the consensus of judicial opinion is to the effect that it is the absolute duty of the judiciary to determine whether the constitution has been amended in the manner required by the constitution, unless a special tribunal has been created to determine the question; and even then many of the courts hold that the tribunal cannot be permitted to illegally amend the organic law. There is some authority for the view that when the constitution itself creates a special tribunal, and confides to it the exclusive power to canvass votes and declare the results, and makes the amendment a part of the constitution as a result of such declaration by proclamation or otherwise, the action of such tribunal is final and conclusive. It may be conceded that this is true when it clearly appears that such was the intention of the people when they adopted the constitution. The right to provide a special tribunal is not open to question; but it is very certain that the people of Minnesota have not done so, and this fact alone eliminates such cases as Worman v. Hagan, 78 Md. 152, 165, 27 Atl. 616, 21 L. R. A. 716, and Miles v. Badford, 22 Md. 170, 85 Am. Dec. 643, as authorities against the jurisdiction of the courts.

In Worman v. Hagan it appeared that the constitution made it the duty of the .Governor to make publication of the proposed amendment, and, if it appeared that a majority of the electors had voted in its favor, to issue a proclamation declaring that it had been adopted, and henceforth it became a part of the constitution. It does not appear how the Governor was to ascertain whether the proposed amendment had passed. It was held that the action of the Governor was final, and the conclusion was rested upon the theory that the special tribunal had been created by the constitution itself. "It will be seen," says Mr. Justice Bryan, "that the constitution confides to the Governor exclusively the power and duty of ascertaining the result of the vote from an examination of the returns made to him. And on his proclamation that the proposed amendment has received a majority of the votes cast, it becomes eo instante a part of the constitution. There is no reference of the question to any other officer or to any other department. It is committed to the Governor without qualification or reserve, and without appeal to any other authority. Most certainly no jurisdiction is conferred on this court to revise his decision. It may be asked what is to be done in case the Governor should violate his duty and wrong-

fully proclaim an amendment as adopted which in point of fact had been rejected. It would not be becoming in this court to suppose that such a contingency would ever happen. The courtesy due to the executive department forbids us to entertain such a conjecture. But if, unhappily, in future times it ever should occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and redress offenses against its sovereignty. Having neither the means nor the jurisdiction to determine the result of the voting on the amendment, we disclaim all intention to investigate the question; but nevertheless we will advert to a suggestion made on the subject."

Having thus determined its incompetency, the court proceeded to discuss the evidence and reached the conclusion that the amendment in question has been legally adopted as a part of the constitution. The decision is not very satisfactory, nor very conclusive, even if it is conceded that the constitution under consideration created a special tribunal. No authorities are cited. The conclusion assumes that, because the constitution imposed certain duties on the Governor, it was the intention to deprive the judicial department, which is created by the same instrument, of its inherent power to determine the legality of the actions of officers.

Miller v. Johnson, 92 Ky. 589, 596, 18 S. W. 522, 15 L. R. A. 525, is an interesting case which has some bearing upon the question. Acting under the authority of the constitution, the legislature provided for calling a constitutional convention to frame a new constitution for submission to the people. The constitution provided for such a convention, but did not require that the work of the convention should be submitted to a popular vote. The convention met and drafted a complete constitution and provided for its submission. The people voted for its adoption. The convention then reassembled and made numerous changes in the instrument which had been adopted. As thus changed, the new constitution was promulgated by the convention. The court declined to determine the legality of the procedure. The distinction between political and judicial questions was referred to; but the decision seems to rest on the fact that it was, as said by Chief Justice Holt, "a case where a new constitution has been framed and promulgated according to the forms of law. Great interests have arisen un-

der it; important rights exist by virtue of it; persons have been convicted of the highest crimes known to the law according to its provisions; the political power of the government has in many ways recognized it, and under such circumstances it is our duty to treat and regard it as a valid constitution and now the organic law of our commonwealth."

It is conceded, however, that in a case like that at bar the court would have jurisdiction. The question under consideration, said the court, was not "whether merely an amendment to a constitution, has been adopted as required by that constitution. If it provides how it is to be done then, unless the manner be followed, the judiciary, as the interpreter of that constitution, will declare the amendment invalid" —citing Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609, and State v. Tufly, 19 Nev. 391, 12 Pac. 835, 3 Am. St. 895.

Luther v. Borden, 7 How. 1, 40, 12 L. Ed. 581, is always cited by those who assert that the courts have no power to determine questions of a political character. It is interesting historically, but it has not the slightest application to the case at bar. When carefully analyzed, it appears that it merely determines that the federal courts will accept as final and controlling a decision of the highest court of a state upon a question of the construction of the constitution of the state.

The state of Rhode Island, unlike the other states, did not adopt a new constitution when it entered the Union, but continued under the old charter which it had received from Charles II in 1663. The people finally outgrew this archaic instrument, and demanded a revision which would extend the suffrage and in other ways modernize the government. The legal power of initiative rested with the charter government, which was controlled by the conservative landholding element, which benefited by the existing system. In 1841 the people, acting without direct legal authority, held a convention and framed a new constitution, which was submitted to a popular vote and declared adopted. Under it a new set of state officers were elected. All this was done in utter disregard of the existing laws. Its justification, if any existed, was found in a general right of a majority of the people to frame such a government as they pleased, so long as it was republican in form. Dorr, who had been elected Governor under the new constitution, attempted to get possession of the public offices and records by

force. The charter government declared the state under martial law and appealed to the President of the United States for assistance. The President publicly announced his support to the charter government, and Dorr's government thereupon disappeared from the scene. It had existed, even in form, but for one or two days, and it is apparent that Webster was right when he denounced it as a political sham, all "paper and patriotism." Dorr fled from the state, but was thereafter indicted, brought back, and convicted of treason. On his trial the court refused to receive evidence offered to sustain the claim that the Dorr government had been established by a vote of the majority of the people, thus holding that the charter government had never been supplanted. But before Dorr was brought to trial the charter government had, on its own initiative, submitted a new constitution to the people, and it had been adopted and gone into effect. The court which tried Dorr thus derived its authority from the regularly adopted new constitution. Whatever may have been the right of the people to adopt the Dorr constitution, their action had been nullified by the subsequent adoption of the regularly submitted instrument. The court which tried Dorr was thus in position to pass upon the question without determining the validity of the government of which it was a part. By excluding the evidence offered on behalf of Dorr, it necessarily decided that the government under which the defendant had assumed to act was illegal.

Later the matter came before the federal courts in an action of trespass brought by Luther, a citizen of Massachusetts, against Borden for breaking and entering his house. Borden justified upon the ground that at the time of the breaking the state was under martial law, and the act had been committed while he was in the military service, acting under the orders of his superior officers, for the purpose of arresting the plaintiff, who was aiding and abetting an insurrection against the state. The circuit court declined to receive evidence tending to show that the Dorr government was the legitimate government. It appeared that the state court had already decided that the charter government continued in force until it was superseded by the constitution of 1843, and Chief Justice Taney based the decision, which affirmed the judgment of the circuit court, upon this ground. "The point, then, raised here," said he, "has been already decided by the courts

of Rhode Island. The question relates altogether to the constitution and the laws of that state; and the well-settled rule of this court is, that the courts of the United States adopt and follow the decisions of the state courts in questions which concern merely the constitution and laws of the state." It also appeared that the charter government had been recognized as legitimate by the President of the United States, and that fact alone, on general principles, and under the act of congress of February 28, 1795 (1 St. 424, c. 26), precluded the federal judiciary from inquiring into the legality of the government thus recognized. Jones v. U. S., 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691; The Divina Pastora, 4 Wheat. 52, 4 L. Ed. 512. The argument had covered a wide range, and Chief Justice Taney, after conceding that the decision of the state court and the action of the President were controlling, proceeded to state the reasons why the state court decided the case properly. In the course of the discussion he used the language which has been so frequently relied upon in cases involving the right of the judiciary to determine whether a constitution or constitutional amendment has been legally adopted.

(b) The doctrine that all political power is vested in the people is the fundamental principle of American constitutional law. The constitution, which is the basis of the government, is the creature of their power and the instrument of their convenience. It is the work of the people acting in their original sovereign capacity. By it they organize the government and determine the powers and duties of the different departments, officers, and agencies. In framing and adopting this instrument the people exercise inherent political power, which includes the whole of government. This power seems to be naturally divisible into three elements, which for convenience and safety are generally devolved upon different departments. The power and duty to make, declare, and execute the will of the people is thus delegated to different agencies, all of which, however, exercise what in the broad and general sense is called "political power." Neither department can legally exercise the powers which in the constitutional distribution are granted to any of the others. A grant to one is a denial to the others.

The meaning of executive, legislative, and judicial power is fairly well understood; but much confusion has resulted from the use of

the word "political" to describe a class of powers which are not judicial, but may be either legislative or executive. Many questions arise which are clearly political, and not of judicial cognizance. Thus the recognition of a foreign sovereign or government, the adjustment of boundaries, the existence of a state of war or belligerency, and whether a proposed new constitution has been adopted by a state, are clearly political questions. The Divina Pastora, supra; Kennett v. Chambers, 14 How. 38, 14 L. Ed. 316; The Nueva Anna, 6 Wheat. 193, 5 L. Ed. 239; Williams v. Suffolk Ins. Co., 13 Pet. 415, 10 L. Ed. 226; Luther v. Borden, supra; Foster v. Neilson, 2 Pet. 253, 7 L. Ed. 415; Jones v. U. S., 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691. A different class of political questions is illustrated by Giles v. Teasley, 193 U. S. 146, 24 Sup. Ct. 359, 48 L. Ed. 655, and Giles v. Harris, 189 U. S. 475, 23 Sup. Ct. 639, 47 L. Ed. 909.

The questions which arise within the sphere of state action are less easily differentiated. When the Governor vetoes a bill, he exercises a political power; but, when he removes a subordinate officer, he is said to exercise an administrative power. What is generally meant, when it is said that a question is political, and not judicial, is that it is a matter which is to be exercised by the people in their primary political capacity, or that it has been specifically delegated to some other department or particular officer of the government, with discretionary power to act. See State v. Cunningham, 81 Wis. 440, 497, 51 N. W. 724, 15 L. R. A. 561; In re Gunn, 50 Kan. 155, 32 Pac. 470, 948, 19 L. R. A. 519; Green v. Mills, 69 Fed. 852, 16 C. C. A. 516, 30 L. R. A. 90; Fletcher v. Tuttle, 151 Ill. 41, 37 N. E. 683, 25 L. R. A. 143, 42 Am. St. 220.

Thus the legislature may in its discretion determine whether it will pass a law or submit a proposed constitutional amendment to the people. The courts have no judicial control over such matters, not merely because they involve political questions, but because they are matters which the people have by the constitution delegated to the legislature. The Governor may exercise the powers delegated to him, free from judicial control, so long as he observes the laws and acts within the limits of the power conferred. His discretionary acts cannot be controllable, not primarily because they are of a political nature, but because the constitution and laws have placed the particular matter under his con-

tról.  But every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the legislature.  One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official action.  The recognition of this principle, unknown except in Great Britain and America, is necessary, to "the end that the government may be one of laws and not of men"—words which Webster said were the greatest contained in any written constitutional document.

The wise statesmen who framed the early American constitutions feared that party passion, guided by private interests, would be liable to lead to frequent tampering with the fundamental law.  The federal constitution had departed from the English model, under which the constitution of the government could be changed by a simple legislative act.  The period immediately following its adoption was one of unrest.  Tumultuous assemblages, without color of legal authority, claimed the right, not only to dictate the present policy of the government, but also to amend the constitution.  1 Curtis, Const. Hist. U. S. 261.  The ancient Aristotelian theory of the eternal fixity of constitutions had long been abandoned.  It was necessary to provide means for change as experience disclosed the weakness of existing systems. As John Stuart Mill has said: "No government can now be expected to be permanent unless it guarantees progress as well as order; nor can it continue really to secure order unless it promotes progress.  It can go on as yet, with only a little of the spirit of improvement.  While reformers have even a remote hope of effecting their objects through the existing system, they are generally willing to bear with it.  But when there is no hope at all, when the institutions themselves seem to place an unyielding barrier to the progress of improvement, the advancing tide heaps itself up behind them till it bears them down."

In making provision for amendment, it was therefore designed to provide for growth and progress, as well as stability.  As said by Jameson in his learned work on Constitutional Conventions: "Provisions

regulating the time and mode of effecting organic changes are in the nature of safety valves. They must not be so adjusted as to discharge their peculiar functions with too great facility, lest they become the ordinary escape pipes of party passion; nor, on the other hand, must they discharge with such difficulty that the force needed to induce action is sufficient to explode the machine." Recognizing this principle, the people of most of the states inserted in their constitutions provisions for their own amendments, thus deliberately placing restrictions upon their own freedom of political action. Webter's Works, vol. 6, pp. 221–227; Duncan v. McCall, 139 U. S. 461, 11 Sup. Ct. 573, 35 L. Ed. 219. The principle was thus established that the people in the mass can no more legally act contrary to the constitution than can one individual or a number of individuals. It is true that they possess the physical power, regardless of legal right, to disregard the constitution; but this is revolution. Having by their voluntary political action founded the government and provided a method for the amendment of the instrument which expresses their will, they must, if they would act lawfully, respect their own mandate. If a change is desired, it must be effected by amendment by means of the constitutional procedure or through the exercise of the primary right of revolution, which is extralegal and in disregard of all law. Of course, no amendment of a constitution can be adopted unless it has received the requisite vote. This is vital; but an amendment which is submitted to the people in disregard of the constitutional mandate is ineffective, although the vote may be in its favor. Such a vote would be as effective, had it been taken at a mass meeting by a show of hands, or manifested by a clashing of shields as in the ancient Witenagemote of our forefathers. Whether the constitution has been complied with, and what the existing law is, is necessarily a judicial question for the courts to decide, unless the constitution itself provides to the contrary by imposing the duty in the particular instance on some other special tribunal.

A different question is presented when the issue is as to which of two rival governments is legitimate. It may be that such questions are not the subject of judicial determination. A court must exist by virtue of a constitution. It is a constituent part of the government, and can act only by virtue of power conferred by the constitution. The acceptance of judicial office is a recognition of the authority of the gov-

ernment from which it is derived, and if the authority of that government is overthrown the power of its courts and other offices is necessarily annulled. If a court should conclude that the government under which it is acting had been displaced by an opposing government, it would cease to be a court and be incapable of pronouncing a judicial decision upon the question. If it decided at all as a court, it must affirm the existence and authority of the government under which it exercised judicial power, and this would preclude all judicial action. It follows that it is not competent for a court to inquire into the validity of the government under which it exists. But this doctrine must not be misapplied. It is applicable and controlling only when the government's very right to exist is involved. It does not preclude the courts from determining judicial questions which do not involve the fundamental question of the legal existence of the government. Carried to the extreme, the doctrine would deprive a court of the power to try a person charged with treason, or any other crime, the essence of which consisted of a denial of the rightful and legal existence of the government.

(c) We come, then, to the question whether the constitution of Minnesota has provided a special tribunal and charged it with the duty of determining whether a constitutional amendment has been adopted by the people, and thereby withdrawn such power from the judiciary. If it has, then the decision of that tribunal, if it has acted according to the laws of its creation, is final and conclusive. But the constitution created no such tribunal. It merely provides for the submission of the proposed amendments to the people at the general election, and "if it shall appear in a manner to be provided by law" that a majority of the electors voting at the election have voted for and ratified such amendments the same shall be valid to all intents and purposes as a part of the constitution. The manner in which the result of the voting is to be determined and declared is thereafter to be determined by the legislature. In the performance of this duty the legislature enacted chapter 168, p. 216, Laws 1905, which provides that the returns of the voting shall be "made and certified within the time, such votes canvassed, and the result thereof declared in the manner provided by law with reference to the election of state officers." If it appears from the result of the

·canvass that the majority of the voters voting at the election have voted for and ratified the amendment, "the Governor shall make proclamation thereof, and such amendment so ratified shall take effect and be in force as a part of the constitution."

The legislature could not create a new judicial tribunal, which would be free from the reviewing jurisdiction of this court. That it was not the legislature's intention to create a special statutory tribunal with final authority to determine the question is placed beyond controversy by the subsequent statute, which removed every possible doubt by expressly providing for a judicial contest in such a case. R. L. 1905, § 336. The method of canvassing votes with reference to state officers is prescribed by sections 326, 327, R. L. 1905. The state board of canvassers consists of the secretary of state, two justices of the supreme court, and two judges of the district court. This board is required to ·open and canvass the certified copies of the statements returned by the county canvassing boards and prepare therefrom a statement of the whole number of votes cast at such election for candidates of the different state officers, the names of the persons receiving such votes, and the number received by each, specifying the several counties in which · they were cast. It shall then subscribe and certify the correctness of such statements and declare the result.

It will be noted that this board does no more than tabulate the reports received from the various county boards and add up and certify the results. State v. Mason, 45 Wash. 234, 88 Pac. 126, 9 L. R. A. (N. S.) 1221. It is settled law that the decisions of election officers and canvassing boards are not conclusive, and that the final decision must rest with the courts unless the law declares that the decisions of the board shall be final. We need not determine whether the action of a special statutory board can be made final and conclusive, as neither the constitution nor the statutes declare that such shall be the effect of the state canvassing board's certificate. The correctness of the conclusion of the state board rests upon the correctness of the returns made by the county boards, and it is inconceivable that it was intended that this statement of the result should be final and conclusive, regardless of the actual facts. The proclamation of the Governor adds nothing in the way of conclusiveness to the legal effect of the action ·of the canvassing board. Its purpose is to formally notify the people

of the state of the result of the voting as found by the canvassing board. Jameson, Const. Conv. (4th Ed.) § 523.

3. The state also contends that, even though the courts have jurisdiction to determine whether a constitutional amendment has been legally submitted and adopted, regardless of the certificate of the canvassing board and the proclamation of the Governor, no proceedings can be maintained in this instance, because the statutes of the state provide no adequate procedure for representation by the people and for making effective any judgment the court may render. The statute proposing the tax amendment was approved April 13, 1905, and at that time there was no provision for contesting the declared result of the vote on a proposed constitutional amendment. The amendment in question was voted upon at the general election held in November, 1906. Prior to the election, on March 1, 1906, the Revised Laws of 1905 had gone into effect, so that when the people voted on the amendment the statute contained a provision to the effect that "any voter may contest the election of any person for or against whom he had the right to vote, who is declared elected to state, county or municipal office, or the declared result upon a constitutional amendment or other question submitted to popular vote, by proceeding as follows." [R. L. 1905, § 336.] When the contest relates to the election of an officer, the party contesting shall file with the clerk of the district court of the county of his residence, within ten days after the canvass is completed, a notice of such appeal to such court and cause a copy thereof to be served upon the contestee. When the contest relates to a matter submitted to popular vote which affects the entire state, the notice of appeal must be served on the secretary of state. This notice shall be treated as a pleading in the case and shall be delivered in the same manner as the summons in a civil action. The testimony on the contest shall be taken and the matter treated and determined in the same manner as such questions are treated by the court.

The objection to the statutory method provided for a contest does not strike us as having any particular force. The statute was originally intended to govern contests between rival claimants to an office, and, when the provision authorizing a voter to contest the declared result of the vote upon a constitutional amendment was added, the statute was not changed, so as to provide for the peculiar conditions which might

arise upon such a contest. Section 336, R. L. 1905, was in force when the amendment was voted upon, and it controlled the proceedings thereafter instituted. It authorized a judicial review, and the court had inherent power to supply any deficiencies in the procedure. As said in Whaley v. Bayer, 99 Minn. 397, 109 N. W. 596, 820: "Where jurisdiction over certain subject-matter is conferred upon a court, and no procedure is provided by statute, the court will proceed under its general powers, and adopt such procedure as is necessary to enable it to exercise and make effective the jurisdiction thus granted."

The inadequacy of the bond which the contestant is required to file is no argument against the jurisdiction of the court or the applicability of the statute. It is the same bond which is required in the case of a contest against a person declared elected to a state office, and the expense may be as great in the one case as in the other. The provision for service on the secretary of state is intended to convey notice to the people of the state in their collective capacity, and the necessary inference is that the officer upon whom the service is made must take the requisite steps for the defense of the public interests. This he did by delivering it to the attorney general, whose duty it is to appear for the state in all cases, "whenever in his opinion the interests of the state require it." Section 56, R. L. 1905. It appeared from the statement of the canvassing board and proclamation of the Governor that the amendment had been adopted and was therefore a part of the organic law. A contest of this character affects the interests of the entire state, and the attorney general was naturally of the opinion that the public interests required him to appear and represent the public.

The statute provides for the preservation of the ballots for a reasonable time, in order that they may be examined and recounted, should occasion require it. Section 312, R. L. 1905, provides that, "as soon as practicable after each ballot box has been sealed, it shall be deposited with the clerk of the municipality or town, and there remain with unbroken seals until the next general election, unless previously opened by proper authority for examination or recount."

The claim that the court has no process by which to make effective the judgment it may render in a proceeding of this character may be true; but it has power to determine that the amendment was or was not adopted by the vote of the people, and its judgment will be

respected by all whose actions are affected thereby. Such a judgment executes itself. Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536. The constitutionality of future legislation and the rights of parties thereunder are determined by the judgment of the court upon the question whether an amendment is or is not a part of the constitution.

4. It being thus established that the courts have jurisdiction to determine whether the tax amendment to the constitution was adopted, and that the statutes provide adequate machinery for contesting the declared result of the voting, we reach the question whether, upon the facts as found, the lower court was correct in its conclusion that the amendment had not received a majority of all the votes cast at the election. There are comparatively few cases which involve contests of this character. The ordinary statutory election contest is an adversary proceeding, wherein the candidate defeated on the face of the returns is the contestant and the candidate returned as elected is the contestee. The power of courts to determine such contests is purely statutory. They have no inherent common-law or equity powers over elections. Ogburn v. Elmore, 123 Ga. 677, 51 S. E. 641; Quartier v. Dowiat, 219 Ill. 326, 76 N. E. 371. But the legislature may confer the power on the courts and determine the manner in which it shall be exercised. When the contest is between rival claimants for an office, the interest of the general public is remote, and the legislature may waive the right of the state to be a party to the proceedings. Boring v. Griffith, 1 Heisk. (Tenn.) 456; State v. Lewis, 51 Conn. 113; 15 Cyc. 402. But, when the contest is as to the result of a vote of the people on a public matter, in which no candidate is directly interested, provision must be made for making the public a party. Metamora v. Eureka, 163 Ill. 9, 45 N. E. 209; Perry v. Whitaker, 71 N. C. 477.

Such a contest is not in a strict legal sense an adversary proceeding. It is neither an action at law nor a suit in equity. Ogburn v. Elmore, supra. It is more in the nature of an investigation for the purpose of discovering the truth, in the result of which no individual has any direct personal interest antagonistic to the general public. It must be carried on in the way authorized by the statute, and an orderly proceeding requires that the general rules for the production of testimony shall be observed. But it is not necessary or desirable that every tech-

nical rule of evidence shall be observed with extreme nicety, nor should the result in a matter of such public importance be determined by a nice balancing of presumptions and probabilities. The present contest affords a very good illustration of the danger of applying technical rules of presumption to such large matters. The tax amendment was voted on by the people at a general election, and after duly canvassing the returns the state canvassing board certified that it had been adopted. The Governor thereupon issued his proclamation, and the amendment became, in form at least, a part of the constitution. The executive department of the state government thereafter recognized the amendment as being a part of the organic law. The legislature enacted statutes which recognized it as part of the constitution, and this court, upon the same theory, held that the mortgage registration tax statute was constitutional. All the departments of the government have thus recognized the amendment as a part of the organic law. It has been held that, when there is such general acquiescence, the courts will not consider whether a constitution was properly adopted. Taylor v. Com., 101 Va. 829, 44 S. E. 754. Under such circumstances a court certainly should not permit the finding of the canvassing board to be overthrown, unless it is shown by very conclusive evidence that the amendment was never in fact adopted.

Proceeding under section 336, R. L. 1905, the contestant filed a petition with the clerk of the district court of St. Louis county, which fully stated the points upon which the contest would be made. Proper service thereof was made on the secretary of state and the papers were by him transmitted to the attorney general, who, after objecting to the jurisdiction of the court, appeared and thereafter participated in the proceedings. This petition alleged the fact of the submission of the proposed amendment and the certification of the state canvassing board that it had been adopted, and "that in and about the polling, counting, canvassing and returning of said votes by the judges of election, the county canvassing boards in the various counties of said state, the county auditors in the various counties of said state, and the state canvassing board of said state, numerous mistakes, errors, miscounts, wrongs and omissions occurred, and that in truth and in fact the said proposed amendment to article nine (9) of the constitution of the state of Minnesota, relating to taxation, failed to pass, and was not approv-

ed or adopted, but was rejected by the people of the state of Minnesota."

In the "points of contest," which accompanied the petition, it was alleged: That the tally books and tally sheets "furnished to and used by the judges and clerks of the several election districts of the several counties of the state" had printed thereon the proposed amendment of article 9 of the constitution of the state of Minnesota as the first in order, and an amendment of section 16 of article 9 of the constitution of said state, establishing the road and bridge fund, and authorizing the legislature to levy an annual tax for the purpose of constructing and improving roads and bridges within said state, was printed on the said tally books and tally sheets as second in order, whereas upon the official ballots used at said election the amendment relating to the road and bridge fund appeared as the first in order, and the amendment relating to taxation as second in order. That upon the official return sheets of the several election districts of the state the amendments were printed in the same order as that in which they were printed upon the tally sheets. That by reason of this transposition "many ballots cast and votes for the said constitutional amendment relating to roads and bridges were by mistake counted and returned by the clerks and judges" of the several precincts of the several counties of the state of Minnesota "as having been cast in favor of the said amendment relating to taxation, and were so canvassed by the county canvassing boards and so returned to the county auditors" of the several counties of the state of Minnesota, "by whom they were likewise erroneously returned to the secretary of state, and that thereafter said votes were likewise erroneously counted and returned by the state canvassing board." That as a result of said errors the amendment relating to roads and bridges was declared by the state canvassing board to have been not adopted and the amendment relating to taxation to have been adopted. That, if the votes had been correctly counted, returned and canvassed, the amendment relating to taxation would have been declared to have been rejected by the voters. After alleging certain specific errors in the counties of St. Louis, Hennepin, and Ramsey, it was charged that "in each one of the election districts of the several counties of the state" there were cast many votes and ballots in favor of the amendment relating to roads and bridges, all of which votes and

ballots were by the judge of election wrongfully and by mistake and inadvertence counted as votes cast for the tax amendment, and were so canvassed and returned "by the county canvassing boards of the respective counties of Minnesota" and the state canvassing board; that "in each of the election districts of the several counties of the state" there were cast many ballots, upon which no constitutional amendment was voted for; and that in each of the several counties many ballots were cast for the tax amendment by persons who were not legally qualified to vote, and that all of such ballots were counted and canvassed as votes and ballots for the tax amendment.

The contestant thus charged that by reason of the failure to have the amendments printed in the same relative order on the ballots, tally books and tally sheets the judges of election were misled and caused to count the votes for the tax amendment which should have been counted for the road and bridge amendment; that is, the votes were transposed, so that the heavier vote cast for the road and bridge amendment was counted for the tax amendment, and the lighter vote for the tax amendment was credited to the road and bridge amendment. It was charged that this occurred in "each of the election districts of the several counties of the state." It is conceded that the transposition on ballots and tally sheets did in fact occur, but it is denied that the result was as claimed by the contestant. The inspectors counted the original ballots in 654 out of 2,670 election districts in the eighty three counties of the state. In sixty five of the districts recounted the result of the recount was withdrawn under the rulings of the court. In seventy one districts the ballots had been illegally destroyed by the local officials in order to use the ballot boxes for a local election. The court found that "the inspectors counted, or endeavored to count, ballots in all of the counties of said state except two; that in four of the counties they endeavored to count certain precincts, but the ballots therein were lost or destroyed; that in four other of the counties they counted ballots, but the same are not in evidence, the offer of them having been withdrawn by contestants when objection was made; and that ballots from 73 counties were offered and received in evidence, but not all the ballots in any one county were counted or offered or received in evidence."

The state canvassing board certified that there were 284,366 votes cast at the election, and that of these 156,051 were in favor of the tax amendment, which was thus carried by a majority of 13,868. It also certified that the road and bridge amendment was lost by 313 votes. On the theory of uniformity of error resulting from the transposition of the amendments on the ballots and tally sheets, the result of the recount should have given the roads and bridge amendment a majority of 13,868, and left the tax amendment short 313 votes. But no such result appears from the evidence. On the recount of the ballots from 589 districts the tax amendment lost 15,038 votes. By accepting the certified returns in the remainder of the districts as correct, this left the tax amendment short 1,470 votes. The trial court reached the conclusion that as a result of the transpositions the tax amendment had been defeated and the good roads amendment adopted. He assumed that the errors were substantially uniform, and would continue throughout all the uncounted districts. The presumption in favor of the correctness of all the returns was thus found to be overthrown, and the decision was based on the presumption that because of the error being general a uniform result might properly be inferred. "There is not a well-grounded suspicion," says the learned judge, "that a complete recount of the state would result in anything but an increase of the affirmative vote on the roads and bridges amendment, and a decrease on the tax, by many thousands." But the ballots so far as counted did not show a uniformity of error such as it was sought to have inferred from the uniformly operating cause of the trouble. In some of the election districts the judges were not misled, and counted the votes correctly as they were cast. In 168 of the 589 districts the votes were not transposed. In some districts the transposition resulted in a gain for the tax amendment. In 35 precincts the tax amendment gained 288 votes, and on the theory of a complete transposition and uniformity of error this proportion of gain would have carried both amendments. The final result is thus left at least in doubt and uncertainty, and the burden not sustained by the contestant.

But the contestant now contends that the trial court was wrong in holding that the error existed in the uncounted as well as the recounted districts, and claims the right to rely on a presumption that the result of the votes in the uncounted districts was correctly certified

and returned by the county canvassing boards. Having rested after recounting the ballots in part of the districts, he claims the benefit of (a) a presumption that the votes as declared by the canvassing boards are correct and (b) a presumption that the same rate of loss for the tax amendment would have been disclosed in the remaining districts, had the entire state been recounted. He thus claims the benefit of two conflicting presumptions.

There is very little authority for the theory that a contestant, after counting the votes in certain districts, and finding enough errors to overthrow the declared majority against him, may rest and rely upon the correctness of the votes as certified in the remaining districts. The result of such practice would be to shift the burden of counting the other districts to the contestee. When he had counted enough ballots to recover his lead, the burden would shift back, and so on until the end was reached. Ordinarily, in a contest between rival candidates, the contestant in his petition or pleading alleges errors in certain specified voting districts only, and makes no attack on the returns in the others. He may then, of course, rely upon the returns in the unattacked districts and count the returned vote therein as a part of his vote. This was the rule applied in Merkley v. Trainor, 142 Cal. 265, 75 Pac. 656, where the contestee in his answer had expressly alleged that such returns were correct. The issue in such contest is between rival candidates, and there is every reason why the procedure of an ordinary action under definite pleadings should be applied. In the case at bar formal pleadings were not framed. In his petition the contestant alleged the incorrectness of the count in every district in the state, and his evidence showed that whatever errors did occur were generally due to a cause which operated, or may have operated, in every district. Having thus neutralized the effect of the general presumption of the correctness of the returns of the various county canvassing boards, he was not in a position to claim the benefit of a presumption which he had overthrown.

The controlling presumption in this proceeding is that which arises from the statement and certificate of the state canvassing board. In a collateral proceeding this certificate is conclusive (McCrary, Elections, §§ 306, 316; Hoy v. State, 168 Ind. 506, 81 N. E. 509), and in a direct attack it can be overthrown only by very clear and satisfactory

evidence. The burden throughout in this proceeding was upon the contestant. The correctness of the certificate of the state canvassing board depended upon the result of the total vote in the state, regardless of the shifting results in particular precincts. It could be determined only by a recount of the entire vote, or at least of such a proportion thereof that, even if all the remaining votes were counted one way, they could not affect the final result.

Our conclusion, after very careful consideration, is that the findings of fact do not sustain the conclusion that the tax amendment failed to pass, and the judgment is therefore reversed, with directions to enter judgment in conformity with the views herein expressed.

Judgment reversed.

BROWN, J. (dissenting).

I concur in the conclusion that the court has jurisdiction to entertain the contest and that the statute providing therefor is not void for uncertainty, but dissent from that part of the decision holding, in effect, that contestants failed to make out their case, because there was not a complete recount of all the ballots cast at the election. That conclusion is, in my view, in conflict with elementary principles of procedure in such cases and unsound. The contestants charged in their notices of contest irregularities, errors, and mistakes in the returns of the election, and that the true vote showed the adoption of the good roads amendment and the defeat of the tax amendment. To this the state, appearing by the attorney general, made no response by counter notice of an intention to offer evidence on points not specified in the notice of contest, but rested upon the presumptive correctness of the returns and upon the theory that contestants were required affirmatively to prove their case, and, if they could do so, nothing remained for the state to offer. So that the state, as contestee, in no way challenged the accuracy of the election returns as certified by the proper officials. In this condition of the issues the contests proceeded to trial, and upon the final hearing below were consolidated and disposed of as one case. The trial court found from the evidence submitted to it that the good roads amendment received in fact a majority of all the votes cast at the election, but that the tax amendment fell short of

the necessary number for its adoption. This was the reverse of what the election returns disclosed.

There is no question but that the evidence fully sustains the findings of the court. The attorney general makes no contention to the contrary; but he insists, in effect, and a majority of this court sustain him, that because there was not a complete recount of all the ballots cast in every precinct of the state the findings of the trial court cannot stand, and there must be a reversal, because, perchance, if a complete recount had been made, it might have appeared that the tax amendment was in fact adopted by the necessary majority vote. In this I am unable to concur.

It is elementary that election returns properly certified are prima facie evidence of the correctness of the result thereby shown, and in the absence of proof to the contrary, not mere assertion in a notice of contest, import absolute verity and are final and conclusive. To overcome this presumption the evidence of irregularities, errors, or defects must be clear and free from doubt. It is unnecessary to cite authorities to a proposition so fundamental and necessary to the integrity of our elections. It is also elementary that in contest proceedings the contestant, however broad may be the allegations of his notice, is required to go no further with his evidence than to make out a prima facie case in his favor. "They may prove less, but not more, than they allege." Paine, Elections, 824. He may attack by his evidence such of the returns as he chooses, and if he thereby changes the result announced by the official returns he may rely upon the verity of those not attacked and rest his case. At this point, by all rules of proceedings in cases of this kind, the contestee must take the laboring oar and overcome the prima facie case thus made. 5 Am. & Eng. Enc. (2d Ed.) 39; Merritt v. Hinton, 55 Ark. 12, 17 S. W. 270; People v. Thacher, 55 N. Y. 525, 14 Am. 312; Phelps v. Schroder, 26 Oh. St. 549; Lloyd v. Sullivan, 9 Mont. 577, 24 Pac. 218.

There was no attempt to do this in the case at bar. The court holds that it was incumbent upon the contestant to proceed further with the recount, notwithstanding the fact that when he rested his case was complete, and upon the facts then before the court but one conclusion could be reached, and that to the effect announced by the trial court. This is a departure from the settled practice, and in my opinion not

sustained even by the new theory, advanced by the majority opinion, that a constitutional amendment contest case resolves itself into "an investigation for the discovery of the truth," not controlled by the rules of procedure appropriate to analogous cases. But even in that view the "investigation" has been had, the truth declared, and the conclusions of the trial court should be sustained.